SNOOK–ROENTGEN MFG. CO. v. STETSON HOSPITAL OF PHILADELPHIA.

(District Court, E. D. Pennsylvania. December, 1914.)

No. 1359.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—X-RAY MACHINE.

The Snook patent, No. 954,056, for an X-ray machine, which is of a different type and operates upon different principles from those of the prior art, but accomplishes superior results, *held* not anticipated by prior publication, valid, and infringed.

In Equity. Suit by the Snook-Roentgen Manufacturing Company against the Stetson Hospital of Philadelphia. On final hearing. Decree for complainant.

C. D. Ehret, of Philadelphia, Pa., for plaintiff.

Wm. B. Linn and Paul M. Elsasser, both of Phildelphia, Pa., and O. Ellery Edwards, Jr., of New York City, for defendant.

DICKINSON, District Judge. This case involves the validity of letters patent No. 954,056 for an improved X-ray machine. The controversy is between two makes of machine. One is that of the plaintiff. The other is that of the Waite & Bartlett Manufacturing Company, which is the real defendant in the case, in that it has undertaken the defense. The defendant of record is a mere user, and in a real sense a nominal defendant.

The defense is a denial of infringement, which is, however, involved in the defense of anticipation—a denial that the plaintiff's patentee was the first inventor. Both machines are made under the licensed use of the Lemp patent, No. 774,090. The plaintiff defends

its proprietary right from a position which is entrenched by admitted, as well as proven, facts which makes its position a strong one.

The facts are that the machine which embodies the claimed invention is one which is highly useful and of almost incalculable benefit to mankind; it has met the supreme test of commercial success, and the field upon which the defendant machine seeks to enter was previously in the sole occupancy of the plaintiff. The users of such machines, who are a highly trained class of men, well equipped to exercise discriminating judgment of the merits of such devices, had accorded the plaintiff the practical tribute of their patronage. The Snook apparatus has further won a recognized place in the world literature of the art.

The admission of these facts, although frankly and ungrudgingly made by the makers of defendant's device, is forced by not only the commercial record of the plaintiff's device, but by the further fact that the two machines are to all practical intents one and the same. Defendant must therefore accord a full meed of praise to the device of the plaintiff or condemn its own. This carries also the admission of the fact of infringement, unless the claims of plaintiff's patent are so restricted as to exclude all machines which embody the one feature in which the defendant's device differs from that of the plaintiff. This difference will be referred to later.

We are relieved from any special consideration of the allowance of particular claims, because the admission is further frankly made that the plaintiff is entitled to all it claims or to nothing. This concession is the child of the contention of defendant that the file wrapper of the patent in suit shows that as the cost of securing its patent the meaning of its claims was restricted to a type of machine which excludes that of the defendant. If the claims are so read, the defendant has not infringed, and the patent of plaintiff goes unchallenged by defendant. It may therefore have all its claims allowed. If, however, the reading of the claims is made so broad as to take in the defendant's machine, then it is asserted the patent is invalid, because the plaintiff's patentee was not the first inventor, but merely constructed a machine which had been invented and fully described by Von F. S. Koch, of Dresden, whose firm of Koch & Sterzel were German competitors in the same field of activity with both the plaintiff and defendant. If such be the fact, the plaintiff takes nothing.

To grasp the thought upon which each of these positions of no infringement or no patent is based, we must consider both of them in the first instance together. The startling suddenness with which the accidental discovery of Roentgen aroused the astonished admiration of the world, and the possibilities of usefulness which the discovered fact was at once universally recognized to have, has made what the X-ray machine can do familiar to all. It has enabled the eye to see and photographs to be taken of what was before hidden under a hopelessly impenetrable veil. When the fact that this miracle could be wrought was once known, a machine to do the work was soon constructed. There was in none of these machines, considered as mere machines, a single novel element. Every one was too eager to

produce the result to lose any time over devising the best means as long as the well-known means would suffice. Since then all efforts have been directed principally along the line of so adapting and improving these well-known means as to take a better picture and shorten the time of taking it, and to protect the machine itself and render its use less hazardous to the operator. The scientific minds, among those which were employed in the problem presented, at once busied themselves in ascertaining the principles in accordance with which the phenomena presented appeared.

There would seem to be reason to believe that there is not yet an entire concord of opinion. Indeed, some of the difficulties presented in the decision of this case arise out of such differences. The courts, of course, have no mandate to settle scientific controversies, and the danger always exists that the discussion of the scientific or mechanical principles may crowd out of consideration the legal principles involved. The former principles, however, may comprise the facts out of which the law of the case arises, and to this extent, at least, they must be grasped and mastered.

The machines with which we are concerned may be roughly classified as induction coil and transformer types of machines. It would seem to be a fact (although one of no legal value) that there is yet a difference of opinion of the comparative merits of these types. At all events, they are both still in use. The one first in use was the induction coil. The operation of this type of machine was commonly understood to depend upon certain electrical principles. Indeed, one of the obstacles to the introduction of the Snook machine, which was the first and soon became a widely known example of the transformer type, was the criticism that it was built on wrong principles. It won a place for itself by the practical demonstration of good work results rather than by the conversion of its users to an acceptance of the principles of its operation.

Upon the discussion of these scientific features we will not presume to enter, but will leave this to the trained minds of the experts, including counsel. For the application of the legal principles with which we are more directly concerned, a few of the scientific facts will suffice.

Every one knows that light—light as commonly known—will penetrate certain substances and will not others. To express these facts we have the words "transparent" and "opaque." The discovery of Roentgen has, in most important measure, done away with this difference between substances. We know that what we call the X-ray will penetrate substances which ordinary light will not. This power of penetration is associated in the mind with the idea of intensity. It would seem that we must have this intensity of rays. To get them a tube is constructed from which the air has, so far as possible, been exhausted. This gives us a high vacuum chamber. An essential agent which these machines are designed to employ is electricity, and a current of electricity is made to pass through the tube. The tube, however, must be specially constructed. The thought of just what takes place within the tube is difficult for the untrained mind to grasp and more difficult to express in words. The accepted conception seems to

be that it is a bombardment from a machine gun at one end of the tube pouring out missiles of almost inconceivable minuteness, projected with a like almost inconceivable swiftness of progression and force against a target at the other end. One to be expected result is a manifestation of heat. There is supposed also to be an effect produced upon the ether, or whatever we call the contents of the tube, after the so-called vacuum is produced. What is ultimately accomplished is that objects hidden behind what would otherwise be opaque substances become visible and may be photographed. This power of penetration and intensity of rays presupposes a powerful current of electricity, and this conception of a bombardment implies the current to be in the one given direction. There must be no reverse current, or "reverse," as it is termed. The desirability and practical necessity for this absence of "reverse" is obvious.

It is not pretended that the last word has as yet been spoken on the subject of these machines. Whatever the relative merits of the two types, the first or induction coil type was at the time of the introduction of the Snook or transformer type confessedly short in performance. Exhaustive efforts were being made to improve it. These efforts were largely, if not wholly, directed to improvements of the tube and to giving the operator the aid of accurate measuring devices. It is at least not clear that any one before Snook thought of abandoning the induction coil and having resort to the transformer type. So fully is Snook identified with the latter type that it is commonly known as the Snook machine. One of the advantages sought was to shorten the time of exposure in the taking of photographs. Another was to produce a ray which would penetrate denser substances than before. Still another was to prevent reverse. Perhaps it would be more accurate to say that the problem was to accomplish the first two results without increasing the risk of reverse, and, if possible, to reduce the risk. The testimony of Dr. Manges presents in a clear light just what Snook accomplished.

The validity of the claims in issue is found to turn upon the principles upon which the Snook machine depends for its success. As already observed, whether a machine so constructed is of less, equal, or greater value than a machine constructed upon different principles, is a matter of no moment. Utility is found because abundantly proven and admitted. An inquiry into the principles of its construction is, however, imperative because the scope of the claims depends upon these principles. The inquiry best begins with a few general electrical facts and then a contrast between the two types of machine. Whether we conceive of electricity as a substance or a force, as a current of something flowing or a force causing a flow, the electricians have brought the idea conveyed by the words "volt" and "ampere" within the common grasp. The further conception of a wave form of movement is likewise familiar. We can present to the mind an alternating current in the well-known sinusoidal wave form, alternately above and below a base line. We can think of these waves as compressed or pinched into sharper peaks, with intervals between the crests. We can catch the thought of the difference between taking only a part of alter-

nate waves and of taking the whole of every wave, and of a relation between the intensity of the current and of the developed X-rays. What is taken may be measured in degrees electrically, the whole being represented by 180 degrees. Mechanically this is divided by two, and in the discussion is spoken of as 90 degrees. Prior to Snook, emphasis was laid upon three things. The sinusoidal wave must be pinched into sharp peaks, only a small part of which must be taken, and to assure results, and no reverse, to have a choke coil, high magnetic leakage, and an arc of less than 50 degrees.

The claimed merit of the Snook machine is that it is constructed with the thought of rejecting all of these features and accepting the opposite. The whole, or as much as possible, of the wave is utilized, the use of a choke coil is avoided, the effort is to get as low a magnetic leakage as can be, and the arc is as near 90 degrees as the danger of inverse and other conditions will permit. The question of just what the measurement will show, or need show, apparently cannot be categorically answered. In the plaintiff's machine it is 67 degrees, and in the defendant's 52 degrees or 54 degrees. Invention could not be denied to one who thus rejected all accepted principles of construction and resorted to their opposites and produced a thing of value. This is what Snook at least thinks he did. Nor is this an afterthought, brought up to buttress his patent, because the same thought is expressed in his application and hammered home again and again throughout the proceedings in the Patent Office. This is, we think, clear. Some principles of the construction of these machines are of universal acceptance. A high pressure flow is demanded. The flow must be continuously in the one and same direction. It is said to be easy to secure this unidirectional flow in a current of low pressure. It is difficult to preserve it under high tension. The use of an alternating current has its advantages. One is to meet the high tension requirement. A low pressure direct current would seem to best meet the other requirement of direction of flow. An effective combination is made by taking from some supply source a current of low pressure flow, turning this into an alternating current of high tension, rectifying it, when introduced to the tube, again into a direct current, but one of high pressure and of such volume and continuity of flow as to produce the desired intensity of rays without reverse.

That the induction coil machines were and still are highly useful machines is not in dispute. That they have their limitations is acknowledged. Whether these limitations are due to the induction coil itself, to the tube, or to what they are due, seems to be still a matter of difference of opinion among experts. One of the accepted principles of their construction was that there passed through the tube these hairpins of current at intervals. Inverse could not be avoided, or at least was difficult to avoid. The plan of opening the secondary current at the time this inverse tried to pass was devised. An attempt was also made to increase the number of these hairpins of current, to decrease the interval between them. Improved tubes also helped some. The problem had not, however, been solved, nor has it yet. One difficulty seems to be a difference of diagnosis. Another is the want of

agreement in the method of treatment, or rather in the philosophy of the method. Some thought, and evidently still think, the trouble to lie in the tube; others, that it rested in the induction coil. Many thought, and evidently, at least, some still think, there is value in this idea of the sharp-peaked waves. This is really aside from the real problem, or at least the whole of the real problem, which perhaps cannot be presented until it is known what goes on in the tube during the intervals between impulses.

Snook's idea was that, when the result to be achieved was the prevention of inverse, the current should be taken from the tip of the sharp peak of a wave; when intensity of rays was desired, the whole wave should be taken. As it was a necessity to have both these results, how much of the wave you would take, or how near to 90 degrees your arc would measure, could not be definitely stated in degrees. An analysis of any one of the system claims in the Snook patent and the application itself discloses this as the thought Snook endeavored to express. The avoidance of reverse was a recognized necessity, and he recognized that he must achieve this at whatever expense in loss of intensity or otherwise. He lays heavy and repeated emphasis, however, on the other requirement of intensity of rays, and the latter is the essential result which his machine was designed to accomplish. He appreciated the fact that the readiest means at hand of reaching one result was destructive of the other, or at least made its accomplishment more difficult. To get the desired intensity he wanted the whole wave, or a 90-degree arc. To avoid reverse he receded to a less arc. The machine which he constructed was, in view of accepted principles, a heretic. He rejected the induction coil. He rejected the hairpin points of current, and boldly essayed to take the whole wave. It is admitted that he produced results, and it cannot be denied that he made an advance, and a bold one, in the art. That, if he has correctly formulated the principles upon which his construction proceeds, he has revolutionized the art, to the extent of the success which has attended him in supplanting the old type of machine with the new, is attested by the reception which the introduction of his machine met. It was, as already stated, condemned because constructed on wrong principles. This, if a true criticism, would deny utility. If not true, it most loudly proclaims invention. Indeed, it proves invention, whether the criticism be just or not. As the machine is an admitted success, it must be that its construction does not conflict with the correct principles of proper construction. Whether the inventor has fully comprehended and accurately analyzed and formulated those principles is of no legal moment. He has conceived and shown us how to produce a new and useful thing, and to what he has produced the law gives him as his reward the exclusive title for the time limited by law.

All we need further inquire is into what this invention is. As set forth in his patent application and claims it is this: A machine to produce more intense X-rays than machines before in use would produce. A machine in which this is accomplished by providing means for exciting—the operation going on within—an X-ray tube to a much

237 F.—14

higher current intensity, so that the required time of exposure is reduced and the power is conferred of penetrating masses of greater density than before. Such a machine is constructed by a combination of parts, by bringing together functional elements consisting of a transformer having a minimum magnetic leakage—a rectifying switch so driven as to keep in time and have definite phase relations with the current supply generator, which is preferably accomplished by mechanically connecting the rotary member of the switch with that of the current generator; assuring by these or equivalent means the absence of reverse current and the passage of all current waves through the tube, to which latter purpose the feature of keeping as close as may be to a 90-degree arc is emphatically emphasized. The result is that we have a machine incorporating a high tension transformer of low magnetic leakage; a synchronous rectifying switch; the utilization of the whole wave current, while preserving the unidirectional flow of the current without reverse, and avoiding the latter; and having the switch and generator so connected as to assure synchronism of action. The feature of the new machine, as contrasted with the old, in that it discarded and rejected the idea of peaking the waves of current and snipping off merely the tips, and substituted for this the opposite idea of taking the whole wave, is emphasized again and again by demanding that the arc be well up to 90 degrees, expressing the thought by the phrases of "nearly 90 degrees," "slightly less than 90 degrees," and equivalent terms.

In the plaintiff's machine (as already noted) this arc is 67 degrees, and in the defendant's at least 52 degrees. This (if there was no challenge of novelty) would bring us directly to the question of infringement. A comparison of the two machines for the purposes of this case reduces the differences of the two machines to the one already adverted to of the difference between 67 degrees and 52 degrees. On the face of the figures neither is 90 degrees, or "nearly so." The expression, however, is only one in degrees, not of degrees. The thought back of it is of ideas, not only different, but antagonistic. The difficulty in finding definiteness of expression for it is a difficulty the expression of which is itself hard to compress into a phrase. There is a territory which was in the occupancy of the prior art. There is a territory which the plaintiff has attempted to mark out for his own. These lie, not in a plane, but on the surface of a globe. To give Abraham the land which lies to the East and Lot that which extends to the West is to avoid conflict between their herdsmen; but if they travel far enough they are bound to come together. In this sense East and West are a twain which do meet.

Some expressions have no meaning except a relative one, and no accuracy except as illustrative. The defendant had the undoubted right to construct such a machine as was then known to the art. This would possess the feature of the utilization of a small part of each alternate wave of current flow. We are assuming he had no right to a machine, the construction of which was based upon the feature of a utilization of the whole of the current wave. These two types of machine are in principle of construction not only different, but opposite; and this

is true although they may become very much alike by the one which is built on the principle of taking little of the current taking more and the one built upon the principle of taking much of the current taking less.

The real question of to which class a machine belongs is to be determined by the principle of construction involved, and not by a measurement of the quantity of current in the absolute. Determined in this way, the defendant's machine is of the Snook type, and not of the prior art type, and we find infringement.

This leaves only in the case the question of anticipation. The defense is in this aspect that what Snook claims to have invented, Koch had before both thought of, described and published in a printed writing. It is, of course, admitted that the Snook invention must have possessed, not merely novelty in the sense of originality, but novelty in the sense also of priority. It is further, of course, conceded that every inventor must be presumed to have known all of what had been described in publications of the art. Nevertheless the basic thought on which the prior publication doctrine rests is that it does not apply to a claimant to a patent who has made a real contribution to the art and one which originated with himself. If he has in fact originated and made this real contribution, he is not to be deprived of his reward, because in the light of his disclosed invention the germ of the same idea can be found to have been hidden away in the writing of some one before him. The inventor of the telegraph was not anticipated because some one before Shakespeare's time had written of a circle around the globe. Just how much of the Snook idea can be seen in the Koch publication depends largely upon the keenness of vision of the investigator. For how much of what he sees he is indebted to the illuminating light shed by the Snook disclosure even he probably does not know. What we do know is that, if Koch had a conception of the Snook machine, he himself did not have in mind to describe or disclose it. If he described the Snook machine, it was unintended, and in this sense accidental. The minds of those skilled in the art were directed to improvements in the tubes, toward the elimination of moving parts in the construction of the machine, and toward facilitating its use by physicians and others, who were not trained electricians, and whose minds were on the work done by the machine, not its workings, by providing them with measuring devices. What Koch had in mind to do was, not to revolutionize the principles on which the induction coil machines were constructed, but to describe an improved tube, of which he had conceived, and to provide the operator with more accurate and dependable means of current measurement.

We find the Koch publications not to have been such an anticipation of the Snook machine as to destroy the patentability of the latter, and nothing in any of the defenses urged which overcome the prima facies of the letters patent owned by the plaintiff.

A decree embodying these findings may be submitted.