STETSON HOSPITAL OF PHILADELPHIA v. SNOOK–ROENTGEN MFG. CO.

(Circuit Court of Appeals, Third Circuit. April 26, 1917. Rehearing Denied September 1, 1917.)

No. 2198.

1. PATENTS ⟨⟩328—VALIDITY AND INFRINGEMENT—X-RAY MACHINE.

The Snook patent, No. 954,056, for an X-Ray machine, covers an invention of a novel character and a high order of merit, in which, by discarding the use of induction coils and utilizing an alternating current, the inventor greatly increased the intensity of the rays and prevented inverse discharge through the tube, adding largely to the utility of the machine; also *held* infringed.

2. PATENTS ⟨⟩312(3)—CONSTRUCTION—PROCEEDINGS IN PATENT OFFICE.

A discussion of questions in the Patent Office in relation to a pending application, as bearing on the construction of the patent later issued therein, must be read in the light of the grounds of the discussion. To detach isolated statements from their setting, and ignore the occasion and question that caused their use, generally leads to a mistake.

3. PATENTS ⟨⟩155—SUIT FOR INFRINGEMENT—COSTS—EFFECT OF DISCLAIMER.

A disclaimer by a patentee, filed after commencement of a suit for infringement, of a statement in the specification which has no bearing on the issues litigated, will not prevent the recovery of customary costs by complainant, if successful.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

Suit in equity by the Snook-Roentgen Manufacturing Company against the Stetson Hospital of Philadelphia. Decree for complainant, and defendant appeals. Affirmed.

For opinion below, see 237 Fed. 204.

O. Ellery Edwards, Jr., of New York City, for appellant.

Cornelius D. Ehret, of Philadelphia, Pa., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In this case the Snook-Roentgen Manufacturing Company, assignees of patent No. 954,056, granted April 5, 1910, to Homer Clyde Snook, for an X-ray system, filed a bill against the Stetson Hospital of Philadelphia, charging infringement of claims 1, 2, 3, 5, 9, 14, 19, 23, 24, 25, 26, 27, and 33 of said patent. On final hearing the court below in an opinion reported at 237 Fed. 204, held the patent valid and said claims infringed. From the decree so holding, defendant appealed to this court.

The real defendant in the case is the manufacturer of defendant's machine. This patent concerns X-ray machines, and as the opinion referred to describes such machines and the general nature of the controversy here involved, we avoid needless repetition by reference thereto. Confining ourselves solely to the questions involved in this controversy, we may say that two of the most important factors in X-ray machines are here involved, viz.: First, an increase in the intensity and penetrating powers of the X-ray produced by the machine; and, second, the decreasing or eliminating of what are called inverse currents in such machines.

[1] Prior to the patent in suit, the X-ray machine in common use was called an induction machine, and its capacity, as measured by milli-

amperes, was about 8.  Snook, who was a trained electrical engineer and a manufacturer of such machines, experimented with that type of machine for a considerable time in a fruitless effort to increase current intensity and eliminate inverse current tendency.  The use of induction coils had characterized practically all machines up to that time, and the whole teaching of the art was in that direction.  In addition to this accepted use of induction coils, the practice of the art was to use what is called peaked wave contact; that is, to so form the electric wave that it evidenced itself in sharp points or peaks, and in so constructing its mechanism that electrical contacts were confined to these sharp peaks, where the contact was brief in time and space, and was followed· by no electrical drag.  Taking, for example, the United States patent to Lemp, No. 774,090, applied for December 1, 1897, and granted November 1, 1904, and which may therefore be taken as a fair example of the trend of electrical thought at that time, we find in Fig. 2 an example of the then use of sinusoidal waves, namely, the extreme upper portion of the wave.

Thus Lemp says:

FIG. 2.

"I propose to utilize *only fractions of the waves, preferably the wave crests* when the potential is at a maximum.  By selecting the wave fractions so utilized from points of like sign in the electromotive force waves, unidirectional discharges through the tube or other apparatus are secured."

Even where Lemp does not use the extreme peak crest of the wave itself, he still confines himself to limited points of contact.  Thus he says:

"I have described my invention as utilizing only the crests of the positive waves; but the same effect is obtained if the crests of the negative waves are utilized.  Certain features of novelty in my invention, however, are not limited to sifting out and utilizing the crests of the waves, for by a proper arrangement of the selector I may derive a current or currents corresponding to any desired point or points in the electromotive force waves, while preventing the flow of current at other points in the wave."

Turning from this state of the art, shown by domestic patents, to the situation abroad, we may refer to Koch's article, published at Hamburg in 1904 and 1905, which was addressed to the problem of inverse discharge, there referred to as Roentgen tubes "free of a closing light," and wherein was described a new bi-cathode tube, which tube, and not any mechanism outside of it, was intended to prevent inverse. discharge.  In discussing his apparatus, Koch says:

"Through proper influence the otherwise more sinusoidal form of separate current impulses is crowded together near the apex, so that commutation, even in abbreviated segments, results without the production of sparks."

By reference to a former article of Koch, to which he therein refers, viz. "Annallen der Physic," he says:

"For producing high peak values a choke coil with relatively small iron cross-section serves best, so that the iron of the choke coil will be magnetized at that part of the curve which approaches the horizontal."

After repeated trials in this field of induction coils and high peak contacts, Snook abandoned it and turned to two other factors, to wit, first, the use of substantially the whole of the sinusoidal curve as a contact element; and, second, the employment of an alternating current. By a suitable switch or rectifier connection, Snook utilized an alternating current in such a way as to secure unidirectional flow, and also used substantially the whole of the broad sinusoidal curve as a sphere of contact.

A study of this art has satisfied us that Snook was a newcomer in this field of X-ray practice. By his discard of the induction coils, and his utilization of an alternating current and the substantial breadth of the whole sinusoidal wave, he has been able to prevent inverse discharge in the tube of an X-ray machine, and at the same time increase tube excitation to 120 milliamperes, as compared with the former practice of 8 milliamperes. The factors which enable him to do this are: First, his high tension switch or rectifier, which passes all the waves, both positive and negative, of an alternating current cycle through the tube always in the same direction. This is done by the use of cross-connectors and parts or segments, which latter are made of such length as to cause the high tension energy delivered by the transformer to persist for a longer time, and for a greater proportion of the entire wave, than had been the practice in the prior art. And, secondly, by availing himself of the low magnetic leakage of a transformer, which by virtue of having such low magnetic leakage contributes with the shortening of the arcs to any suitable point less than correspondence with the full length of the alternating current wave, to prevent inverse discharge. As he states it in his patent:

"These features of very small, if any, phase displacement between current and electromotive force in the secondary $S$ and the conducting arcs of angular length slightly less than a half wave of current guarantee that there will be no inverse discharge in the tube $X$; each of these features contributing to that end."

The transformer of low magnetic leakage was old; but Snook appears to have here taken advantage of such low leaking in combination with other elements to secure for the first time prevention of inverse discharge through the tube. We are satisfied from the proofs that Snook's invention was of a high order of merit, but was so novel in its departure from accepted methods that it had to make a place for itself in the art over the opposition it met as a radical departure from prior practices, and that it secured ultimate recognition only by demonstration of its intrinsic merit. In time, large numbers of these machines have come in use, both in this country and abroad. The testimony as to its novel and really remarkable capacity is without contradiction. The testimony of physicians satisfies us that the best results in former machines, expressed in milliamperes, was about 8 while with the Snook apparatus they were able to obtain 120; in other words, virtually 15 times as great light-exciting power. This ray intensity brought about higher penetrating power, and therefore sharper and more definite photographic reproduction. One physician, when asked to give an example of the work that could be done with

the Snook apparatus, which they could not do with the induction coils, said:

"I should say the most noticeable improvement was in connection with chest work, chest examinations, where we were able to make exposures, in a second or less, and to catch that part of the body at rest, and also to get the heart practically at rest. In the abdomen it is necessary to obtain your average exposures in a second or less, or, at the greatest, about a second and a half, in order to avoid movements of the stomach and also through the small intestines. The stomach and intestines are constantly moving, and, if you want to get a radiograph which will show them stationary, you must use the short exposure, and it was not until the Snook apparatus came in that that was practically available. It greatly increased our field for diagnosis. The chest, especially in connection with pulmonary tuberculosis, although we were able to diagnose advanced lesions with the coil, we could not diagnose early lesions."

Another physician says:

"I could handle children without an anesthetic with this machine; whereas, to do the same work with the coil, you would have to anesthetize them."

He continues:

"Any part in which there is motion requires an exceedingly short exposure in order to get a result that is distinct. For instance, I speak mostly of children, because that seems to me to be the easiest thing to understand. If you want to get a picture of a child's chest, which is an important thing, you cannot tell the child to hold its breath, because it is too young to understand you, and is too frightened to obey you if it does understand. So with the transformer [that is, Snook's machine] it is merely a matter of watching the child, and when it is momentarily still, and between the slight pause between inspiration and expiration, you close the switch, and you have the result. That would be impossible with any induction coil I have ever seen."

He was asked:

"Q. In an adult, are there any moving organs; that is, organs which by involuntary action are always in motion? A. Yes, sir. Q. Can you give an example of that case? A. The gastro-intestinal tract; that is, the stomach and intestines. The stomach is usually in constant motion. The intestines are almost always in motion, and in order to get radiographs or roentgenograms of those organs it is necessary to have exceedingly short exposures. Q. Has this increase in intensity of the X-rays due to the Snook apparatus over the induction coil practice, and resultant shorter exposures, been of any benefit to human kind? A. Oh, the utmost. We can take care of ever so many more patients, and the field of diagnosis has been vastly widened. Q. Because of what? A. Because we are able to make quick exposures and get uniform results. Q. Do you mean to say that you can diagnose with greater certainty certain diseases with the present-day practice than with the coil practice? A. Yes, sir."

We are therefore clear that no error was involved in the court's decree when finding this patent valid.

Turning, now, to the question of infringement, it is clear that the defendant's machine, which substantially reproduces the plaintiff's, infringes the claims here in controversy, unless the proceedings in the Patent Office necessitate a narrow construction thereof. Such contention for a narrow construction is based on the fact that in defendant's machine the actual physical length of the arc of the high tension rectifier switch is 52 mechanical degrees, and it is contended that such length falls short of that contemplated by the patent. The plaintiff's commercial machine has an arc of 67°, the length shown by Figure 3

of the patent drawing, and both it and the defendant's 52° machine operate in precisely the same way to produce identical results. Indeed, the machine used by the plaintiff for illustrative purposes in court, has a 52° arc, and so operated constitutes defendant's machine. When movable extension clips are attached, which lengthen the 52° arc to a 67° one, the machine is then used to illustrate the plaintiff's machine. The two effect the same electrical results, viz. increased excitation and elimination of inverse currents, which, as we have seen, are the objects the patentee had in view.

[2] From the nature of electricity, and its capacity to leap an arc or contact beyond the limits of a physical path of travel, it is clear that a contact cannot be described by the expression in degrees of a mere physical length of arc, but that the real or functional—and function, not form, is the real thing—length of an arc is the physical length of the arc plus the leading and the trailing incident to the contact. Without entering into a detail statement of the discussions in the Patent Office, we think two things are apparent: First, the discussion must be read in the light of the ground which caused the discussion, namely, that the contacts in Lemp's patent, which the Office cited, were contacts with peaked waves, and the issue was not as to the measure of the extent of the plaintiff's contact, but to the fact that it was not the peaked contact of Lemp. Any substantial extent of contact differentiated Snook's application from Lemp, and what was said in discussion should be read in the light of what was in issue and under discussion. To detach isolated statements from their setting, and ignore the occasion and question that caused their use, generally leads to a mistake. In these particular proceedings, however, no room for speculation is left, for it is perfectly clear that the applicant, far from limiting himself to an arc of expressed degrees, expressly gave notice to the Patent Office that he did not. And when he said:

"It is submitted that applicant cannot limit his claim to a certain number of electrical and mechanical degrees, for a variation from any definite number of degrees would still embody applicant's invention"

—and when the Office thereafter granted claims embodying such elements as "the angular extent of an arc corresponding with a length slightly less than a current wave," and "conducting arc of angular extent corresponding substantially with an entire current wave," that what the Office and the applicant both had in view was the broad wave contact of Snook, as contrasted with the peaked crest contact of Lemp.

This field of broad wave contact, in connection with the other elements involved, was Snook's disclosure in an undisclosed field, and we protect Snook's share of that field by affirming the decree entered by the court below.

### On Petition for Rehearing.

PER CURIAM. After due consideration, we are of opinion this petition for a rehearing should be discharged. The patent involved was for a complicated X-ray apparatus, and the different features thereof were covered by 40 claims. In the opinion, which fully outlined its views of the features here involved, this court held that certain of those

claims were valid and infringed. After the suit was begun, but before trial, the patentee saw fit to enter a disclaimer of a statement in the patent specification as follows:

"It was obvious, also, that a source of direct current may be employed in connection with the transformer primary, a pole-changing switch and interrupter being included in the circuit, and driven or operated at desired speed. with a high-tension pole-changing switch or rectifier in the secondary circuit synchronous with the switch and interrupter in the primary circuit."

[3] We are not satisfied that this disclaimer had, or could have had, any effect on the questions we decided. Whether the statement, thus eliminated, remained in or was stricken out of the specification, its presence or absence would not have led to a different conclusion than the one reached. So far as our general views of the case, as well as our general conclusions, are concerned, we have seen no reason to change such views or conclusions; nor are any suggestions now made which make us feel any such doubt as to what has been already decided as to make us feel a second argument is desirable. No question was raised in the court below as to the effect of this disclaimer on the costs. Assuming, for present purposes, it can be initially raised in an appellate court, we see no basis for contending that the elimination from the specification of this—so far as the litigated issue was involved—irrelevant and inconsequential sentence should now prevent the prevailing litigant in that issue from recovering customary costs.

Accordingly the petition for a rehearing is denied.