GENERAL ELECTRIC CO. v. HOSKINS MFG. CO.

(Circuit Court of Appeals, Seventh Circuit. May 20, 1915.)

No. 2152.

1. PATENTS ⟨⟩328—VALIDITY AND INFRINGEMENT—ELECTRIC RESISTANCE ELE-
    MENT.
        The Marsh patent, No. 811,859, for an electric resistance element com-
    posed of an alloy of one of the metals of the chromium group with nickel,
    the latter comprising more than 50 per cent. of the alloy, was not antici-
    pated, and discloses patentable invention; nor is it rendered invalid nor
    materially narrowed by the proceedings in the Patent Office. Also *held*
    infringed.

2. PATENTS ⟨⟩65—ANTICIPATION—PRIOR DESCRIPTION.
        In order to anticipate a later invention, the prior description must be
    such as to show that the article described in the patent can be certainly
    arrived at by following the prior description, without the assistance of
    local knowledge or local prior use in the locality where the description is
    published, and without experimentation.
        [Ed. Note.—For other cases, see Patents, Cent. Dig. § 80; Dec. Dig. ⟨⟩
    65.]

3. PATENTS ⟨⟩21—INVENTION—SUBSTITUTION OF MATERIALS.
        The discovery that a described metal alloy in stated proportions when
    used as an electric resistance element is far superior to any previously
    known except platinum, the cost of which precluded its commercial use,
    with the result of greatly advancing the art, constitutes patentable in-
    vention, although the alloy itself was known.
        [Ed. Note.—For other cases, see Patents, Cent. Dig. § 23; Dec. Dig.
    ⟨⟩21.]

Appeal from the District Court of the United States for the East-
ern Division of the Northern District of Illinois; Arthur L. Sanborn,
Judge.

Suit in equity by the Hoskins Manufacturing Company against the
General Electric Company. Decree for complainant, and defendant
appeals. Affirmed.

For opinion below, see 212 Fed. 422.

This patent was sustained and found to be infringed by the District Court.
It was granted to A. L. Marsh for an electric resistance element on February 4,
1906, as patent No. 811,859. Claim 1 calls for an electric resistance element
composed of an alloy consisting of one of the metals of the chromium group
and of metal having the property of nickel and cobalt, combined in the propor-
tion of more than 50 per cent. of the latter and less than 50 per cent. of the
former. Claim 2 calls for a like element, comprising a strip, strand, or fila-
ment formed of an alloy of nickel and one of the metals of the chromium group,
Claim 3 covers the last-named strip, etc., annealed. Claim 4 calls for a like
resistance element formed of a metal alloy consisting of nickel and chromium.
Claim 5 calls for a like resistance element formed of a metal alloy consisting
of less than 50 per cent. of chromium and more than 50 per cent. of nickel.

"My object," says the patentee, "is to provide as an improved electric re-
sistance material, a metal which has the property of being particularly low
in electrical conductivity, has a melting point exceeding that of pure copper,
and may be drawn or otherwise shaped to form particularly durable, efficient,
and desirable strips, strands or filaments suitable for use in various connec-
tions where electric resistances are desirable."

What the patentee claims is a new use of an old material. The annealed
strips or filaments drawn from an alloy consisting of 90 per cent. nickel and 10

per cent. pure chromium have a melting point exceeding that of pure copper, and a resistance nearly 50 times that of copper. Its temperature co-efficient is low. It does not become crystalline and brittle under heating and cooling, and resists oxidation to a remarkable degree under very high temperature, even when subjected to atmospheric conditions and corrosive fumes. It has a durability more than 150 times that of anything known in the prior art. Any member of the chromium group, such as chromium, molybdenum, tungsten, and uranium, when mixed with nickel or cobalt, form an alloy very low in electric conductivity, very infusible, nonoxidizable to a high degree, tough and sufficiently ductile to permit drawing or shaping into wire, etc., to render it convenient for use as an electric resistance element. Nickel and chromium are preferred. It is adapted to use where very high temperatures are used, 800° to 1000° C. or more. Variations in the related proportions of the metals affect more or less the variation in strength, durability, and resistivity of this alloy. An alloy consisting of 15 per cent. chromium and 85 per cent. nickel drawn into a wire 16/1000 of an inch in diameter has a resistance of about 2.3 ohms per foot. "Iron * * * is readily oxidizable," says Marsh, "and will not answer my purpose when alloyed," etc.

While the patent was in the Patent Office, Marsh made certain changes to meet the objections of the examiner, amounting, in the opinion of appellant, to an abandonment of the alloy now used by him. These matters, together with the effect of the proceedings as shown by the file wrapper, will be discussed in the opinion.

The strongest reference against the validity of the patent is that of the English patent to Emile Placet, No. 202—1896, November 21st. This patent was not before the examiner, nor was it known to Marsh at the time of his invention, so far as the record shows. It relates to a method of introducing pure chromium into metals and alloys in a state of fusion. Speaking of pure chromium, Placet says: "This chromium is absolutely pure. It improves all metals and alloys with which it is mixed by imparting to them the qualities peculiar to itself. It renders them harder, more resistant to shock, tension, and friction, and also renders them more proof against the destructive action of the air, moisture, acids, and high temperatures." "Chromium," he says again, "renders metals and alloys more resistant than heretofore to high temperatures, which renders them highly suitable for the manufacture of tuyeres, hearths, firearms," etc. Again he says, "Chromium increases the electrical resistance of manganese, ferro-manganese, ferro-nickel, and other metals employed in the manufacture of conductors of high electrical resistance."

In an article published at page 89 of the Chemiker Zeitung in 1897, Henri Moisson, speaking with reference to Placet's production of commercially pure chromium, says it may be added to metals or alloys like copper, nickel, etc., and that "it renders the alloy harder, nonmagnetic and increases the electric resistance. * * * Alloys produced in that manner are especially suitable for several purposes," mentioning electric resistances. W. F. Barrett and other scientists, contributing to the Journal of the Institution of Chemical Engineers in 1902, speaking of researches with reference to a large number of alloys, among which are shown alloys containing chromium, recommended alloys consisting of: (a) 70 per cent. iron and 30 per cent. nickel, and (b) 80 per cent. iron, nickel 15 per cent., and manganese 5 per cent.—alloys having a life of about 1/200 of the Marsh alloy as a resistance material. This was after a publication of Placet's discoveries.

Kellner patent, No. 661,610, for improvements in incandescent bodies for incandescent lamps, and in the process of making the same, speaks of chromium and its alloys, in order to produce light filaments run at 1700° to about 2200°, at which temperatures chromium and its alloys would melt.

Osterman and La Croix patent, No. 404,220, granted May 28, 1889, covers a method for making nickel and nickel alloys nonmagnetic, properties necessary in watch springs, wheels, etc., and recommend an alloy of chromium 10 per cent. and nickel 90 per cent., which is the alloy of the patent in suit, but this patent makes no suggestion of the alloy as a resistance element. Patentees propose to alloy nickel and other metals with chromium. Such alloys, they say, "possess a very high elasticity and hardness." Nickel, the patent says, becomes completely unmagnetizable by an admixture of 10 per cent.

chromium. It is possible to alloy up to 30 per cent. chromium with nickel. By the addition of certain other metals patentees obtain malleability for watch springs, etc. Whether the alloy is commercially available does not appear, certainly not as a resistance element. Pure chromium is said by Placet to have been discovered by him some 7 years later than this patent.

Parnacott patent, No. 578,465, dated March 9, 1897, covers practically an alloy resembling German silver, which has a short life at 1000° temperature. The Webster patent, No. 377,918, for metallic alloy, is for practically the same alloy as that last stated.

The alloy of the Fleismann patent, No. 225,977, dated March 30, 1880, consists of zinc and nickel—about 95 per cent. nickel. Zinc boils at a temperature under 1000° C.

O'Neill patent, No. 485,424, granted November 1, 1892, for "Electrical Heater," discloses an alloy which is also practically German silver combined with silicon and tin. It makes no reference to the use of chromium in its alloy.

The foregoing suffice to show the state of the art at the date of the patent. Marsh testified that his discovery came, not through disclosures made by Placet, but by accident when he was working in another field. The resistance of a conductor can be increased or diminished by increasing or decreasing its length and by enlarging or lessening the diameter or cross-section, and by the employment of a material of a high specific resistance. The problem is simply one of convenience. It is not so with durability. It remains constant and inherent in the resistance element.

Appellee contends that Placet did not contemplate a complete operative resistance element, but meant merely to make a statement concerning the physical property of resistivity; that a disclosure of resistance is not a disclosure of a resistance element. Alloys do not necessarily partake proportionately of the properties of their ingredients.

Appellant sought to purchase the patent in suit, and, failing, took appellee's said alloy of nickel and chromium and added a small quantity of manganese and 15 per cent. of iron, admittedly for the purpose of coming within the alleged disclosures of the Placet patent. These additions, appellee contends, served merely as diluents, and in no appreciable degree affected the characteristics of the alloy. This element is termed calorite, and contains nickel 65 per cent., iron 15 per cent., chromium 12 per cent., and manganese 8 per cent. For appellee it is insisted that, for purposes of durability as an electrical resistance element, it is practically identical with its own element.

Appellant contends that the claims in suit are narrow and must be strictly construed; that its own resistance element does not infringe the claims as they read; that, construed in the light of the prior art and the file wrapper, the claims cannot cover appellant's element, which comes within the Placet patent and Marsh's abandoned claim 4, although Placet shows no alloy, used as a high resistance element, having less than 56 per cent. of iron. The patent drawing is that of a rheostat, the resistance element of which is the alloy of the patent. The patentee claims a resistance element as distinguished from a material possessed of high resistivity.

The decree of the District Court granting the injunction and accounting is assigned for error. Other facts appear in the opinion.

Charles Neave, of New York City, and Edward Rector, of Chicago, Ill., for appellant.

Russell Wiles, of Chicago, Ill., for appellee.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

KOHLSAAT, Circuit Judge (after stating the facts as above). [1] At the threshold we are confronted with appellant's attack upon the patent growing out of the proceedings in the Patent Office, which, it is contended, show that appellee abandoned the subject-matter covered by the patent, or at least so narrowed it that it may not now be construed to cover appellant's resistance element. These matters are fully and satisfactorily covered by the opinion of the trial court ([D.

C.] 212 Fed. 422), and we are content to accept the conclusions there arrived at, and to hold that the claims are good for whatever of invention they disclose.

At first blush, appellee seems to have led a daylight assault upon the Placet patent fortifications and to have carried off Placet's somewhat unappreciated offspring from under the very cannon's mouth, for purposes of more ardent, if not disinterested, coddling. Placet, who discovered how to and did make pure chromium at a cost and in quantities suitable for commercial purposes, by the process of electrolysis, claims for his product that:

"It improves all metals and alloys with which it is mixed, by imparting to them the qualities peculiar to itself. It renders them harder, more resistant to shocks, tension and friction, and also renders them more proof against the destructive action of the air, moisture, acids and high temperatures,"

—and says that, by reason of their resistance to high temperatures they are highly suitable for the manufacture of tuyeres, hearths, and fire irons, and that it "increases the electrical resistance of manganese, ferro-manganese, ferro-nickel and other metals employed in the manufacture of conductors of high electrical resistance."

[2] The invention of toasters, heaters, electrical ironers, and the like had begun, and it was apparent that in these, as well as in the art generally, the need of conductors having great durability when subjected to heat was at hand. This involved also substances which possessed the property of ductility to a degree sufficient to permit the drawing of filaments, strands, wire, etc., for use as electrical conductors. Platinum alone was then recognized as an enduring material suitable for conductors which were required to be subjected to great heat. Its cost prohibited its commercial use. Consequently the Marsh discovery was hailed as an available substitute. It was and is a most valuable resistance material. It lasts when subjected to heat from 800° to 1000° C. 150 times as long as anything in the prior art, except platinum, unless Placet may be construed to have disclosed the concept; for unless Placet anticipates Marsh's material as an electrical resistance element, it is not anticipated. It will be seen from Placet's English patent that the patentee leaves it to others to ascertain by experiment products of chromium and metals in alloy suitable for high resistance and those disclosing the element of resistance to high temperatures. Placet's discoveries were before the public about 11 years before Marsh's patent was granted, from which fact it may be at least conjectured that the valuable resistance and duration properties as resistance elements, which appellant finds disclosed therein, were not ostentatiously in evidence. Now, the law is well settled that in order to anticipate a later invention, the prior description must be such as to show that the article described in the patent can be certainly arrived at by following the prior description without the assistance of local knowledge or local prior use in the locality where the description is published, and without experimentation.

In Atlantic Giant Gunpowder Co. v. Parker, No. 625 Fed. Cas., cited and approved by Judge Lacombe in Badische Anilin & Soda Fabrik v. Kalle, 104 Fed. 802, 44 C. C. A. 201, Judge Blatchford says:

"It is not enough to show that, by the lucky accident of taking gunpowder of the proper quality, a compound may be obtained which is unlike that indicated by such description. By the light of what Nobel has taught in the patent sued on, much can now be asserted to be seen in what was published before, which no one ever, in fact, saw in it before the original of the patent sued on was taken out."

In Hogan v. Westmoreland Specialty Co. et al. (C. C.) 163 Fed. 289, Judge McPherson held that the scientific announcement that as the OH group in cellulose molecules "are suppressed by combination (with negative radicals to form the cellulose esters), the products exhibit decreasing attractions for atmospheric moisture," while perhaps sufficient to advise a chemist, was not sufficient to constitute a matter of common knowledge, chargeable to makers of saltcellar tops or dredges, that a celluloid cap would keep the salt dry when a glass or metal cap would not.

To anticipate, a prior patent, says Hopkins on Patents, vol. 1, p. 261, must disclose a substantial representation of the device of the later patent, "in such full and clear terms as would enable one skilled in the art to practice his invention without the necessity of experimenting"—citing several authorities.

In Westinghouse Air Brake Co. v. Great Northern Ry. Co., 88 Fed. 258, 31 C. C. A. 525, the Court of Appeals for the Second Circuit, speaking of an alleged anticipating English patent, says:

"The prophetical suggestions in English patents of what can be done, when no one has ever tested, by actual and hard experience and under the stress of competition, the truth of these suggestions, or the practical difficulties in the way of their accomplishment, or even whether the suggestions are feasible, do not carry conviction of the truth of these frequent and vague statements."

In Schmertz Wire-Glass Co. v. Western Glass Co. (C. C.) 178 Fed. 977–989; affirmed by this court 185 Fed. 788, 109 C. C. A. 1, it was said the alleged prior description cited as an anticipation "must be an account of a complete and operative invention, 'capable of being put into practical operation'"—citing Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33, and other cases.

As before stated, Placet's statements, if taken at their face value, turn out to be untrue in many cases when subjected to experiment. It is not true that when alloyed with metal, chromium always brings to the alloy its own distinctive specific properties. Some reference to the results of experiments had with chromium and some of the metals may serve to show how little Placet understood or imparted to the public on the subject of chromium alloys as resistance elements, viz.:

### Resistivity Not Increased in All Cases by Chromium.

It appears from defendant's Exhibit No. 10, Hansen's Diagram, that an alloy of iron 70 per cent. and nickel 30 per cent. gives a resistivity of 80.5 microhms, while an alloy of chromium 20 per cent., iron 56 per cent., and nickel 24 per cent. gives a resistivity of 79.6 microhms. From the same exhibit it appears that an alloy of iron 67 per cent. and nickel 33 per cent. gives a resistivity of 87.0 microhms. If 5 per cent. of chromium be added, there is a decrease of from 2

to 3 microhms, and an alloy of iron 40.2 per cent., nickel 19.8, and chromium 40 per cent. gives a resistivity of about 85.0 microhms, and that an alloy of iron 63.65 per cent., nickel 31.35 per cent., and chromium 5 per cent. gives a resistivity of about 84.0 or 85.0 microhms. An alloy of copper-nickel, redrawn, treated to 20 per cent. of chromium, reduces from 49.2 to 45.2 microhms. Thus it appears that certain alloys of iron, nickel, and chromium have a less resistivity than the plain ferro-nickel alloy.

### Melting Point Not Increased in All Cases by Chromium.

From the evidence it appears that 10.68 per cent. of chromium, added to 89.32 per cent. of nickel, reduces the melting point 15° C.; 20 per cent. reduces it 30° C.; 35 per cent. reduces it 70° C.

### Durability Not Measured by Resistivity.

Pure nickel has a lower resistivity than iron. When subjected to high heat, from 800° C. to 1000° C., iron has a durability of about 9 minutes as against 32 hours for nickel. Platinum, with a very low resistivity, has a durability, when exposed to heat, beyond that of any other resistance element.

These illustrations might be multiplied many times. They serve to demonstrate that practically the whole matter was by Placet left to experimentation. The various references of Placet to the effect of chromium upon metals and alloys with reference to the effect of high temperatures was not understood by him in any other sense than as substances having a high melting point. The mention of hearths, fire irons, tuyeres, etc., can mean nothing more than that chromium renders metals harder or more suitable for exposure to outside applications of heat. And when he speaks of durability in connection with the manufacture of bells, gongs, etc., he has in mind hardness or toughness. His conductors of high electrical resistance can fairly be said to refer to conductors of high resistivity. When he speaks of chromium as more proof against the destructive action of the air, moisture, acids, and high temperatures, he fails to give any clear idea calculated to lead the public, or one skilled in the art to the device of the patent in suit, unless it be by means of experiments.

There are many elements which affect the efficiency of a resistance element in an electrical circuit. The melting point, while a limit to a material's electrical resistance properties as an element, is not determinative thereof. Resistance to oxidation is an important feature. These are probably the chief factors. There must also be taken into account the temperature co-efficient, the condition of the oxide scale on the resistance material as to density, electrical conductivity, volatility, uniformity of composition of resistance material, and a number of other things. The durability of the Marsh alloy at a heat of 800° C. to 1000° C., Marsh fixes at from 200 to 2,000 times that of any resistance material in the prior art. Can it be supposed that Placet, had he known of its availability as an electrical resistance element, would have overlooked it? or that all those who utilized it afterwards for the manufacture of watch springs and wheels, steel, pig iron and

precision apparatus and light filaments would have passed by, as of no consequence, this great substitute for platinum, had Placet suggested its value to them, or made them understand what it was? Placet could no more claim this resistance element, as disclosed by Marsh, than could Ostermann and La Croix with their watch spring material.

For 11 years this device of Marsh lay hidden as a gem in its Placet matrix. There it might yet be lying had not Marsh found it and made it public. Certainly it never occurred to Placet that this chromium-nickel alloy would produce a rival to platinum as a resistance element at a cost and under conditions which made it an available article of commerce.

The principal advantage to be derived by the use of a material of high specific resistivity, as bearing upon the question of durability, is that the conductor may be increased or diminished in cross-section or length, and thereby made more or less liable to injury or destruction from oxidation or otherwise, and more conveniently housed. High resistance is not serviceable in the absence of high durability. The application of great heat to a resistance element often increases its resistivity, while great heat is the enemy of durability.

In the case of the Chemiker Zeitung extract on the Placet patent, we have the statement that Placet claims that chromium invests its co-ingredient metals with its own properties, and that he assumes an alloy with one metal to be just as good as another for the purposes set out. It asserts that these alloys make admirable resistance elements. As shown hereinbefore with reference to Placet, these statements as to all metals are often found to be untrue and the statements do not strengthen Placet as a reference. They fail to disclose the resistance elements covered by Marsh. Reference is made to disclosures made by Barrett, Brown and Hadfield prior to Marsh. It will be seen that these disclosures pertain to the measurement of electrical resistance and not to an electrical resistance element, which must cover durability as well.

From the foregoing statements it is evident that Placet and the other prior art and prior publication references fell far short of disclosing, even to those skilled in the art, the subject-matter of the patent in suit.

In his argument before the examiner, shown in the file wrapper and contents, Marsh by his attorneys says he—

"does not claim to have been the first to make the alloy itself, but to have discovered that such alloys possess certain properties adapting them for a new field of usefulness."

Again appellee says:

"Some of the most important inventions have consisted in the practical application of the discovery of a new property of matter and this invention is of that class."

And, again:

"The novelty of the patent in suit consists in discovering a new use for the chromium-nickel alloy in which is produced most extraordinary and unexpected results."

And again:

"The basis of the patent is the discovery that a resistance element of the composition specified is suitable for all round use in the various situations in which such elements are desirable."

Thus, the main feature of the patent relied upon as new is the fact that Marsh found by experiment that the alloy of the patent combined with great resistivity, marvelous durability, second only to platinum, under conditions which made its production commercially practicable. Placet merely says chromium renders certain metals more resistant to high temperatures, that is, it increases the melting point in some cases—a very different thing from durability. At most, he is speaking of externally applied heat, which is no criterion for durability under internally developed heat.

[3] It appears from the record that Marsh made his discovery by accident, not as a deduction from Placet, whose patent he does not seem to have known about, and perhaps did not fully appreciate it. Nevertheless he is entitled to all it covers, even though not specified. Grant Tire Case, 220 U. S. 428, 31 Sup. Ct. 444, 55 L. Ed. 527. It was an inventive act on Marsh's part to extricate this most valuable material from the vague generalities and speculative statements of Placet, and place it among the instrumentalities of science as an electrical resistance element. Treibacher Chemische Werke, etc., v. Roessler & Hasslacher Chemical Co., 219 Fed. 210. Here is an element which has made commercially practicable the manufacture of a large line of electrical power using devices, greatly contributing to the comfort of mankind as well as to the rewards of business enterprise. That Marsh was entitled to a patent for the service he rendered in rescuing the alloy from obscurity and placing it in the forefront of electrical resistance elements seems clear under the authorities. He first disclosed the properties and great advantages of the chromium-nickel alloy as a resistance element. So far as the record shows these had never been suggested in any manner calculated to lead to their application to the uses set out in the patent. Marsh substituted the alloy for the ineffective and practically discarded resistance elements of the prior art. The result was such a remarkable advance upon that prior art as to turn failure into unquestioned success. The degree of that success was quite as surprising as that achieved in the celluloid salt shaker case (Hogan v. Specialty Co., supra). It is said by Walker on Patents, § 29, that:

"Where the excellence of the material substituted could not be known beforehand and where practice shows its superiority to consist not only in greater cheapness and greater durability, but also in more efficient action, the substitution of a superior for an inferior material amounts to invention."

To the same effect is Robinson on Patents, vol. 1, pp. 329, 334. The patentable novelty of such an act was upheld in Frost v. Samstag, 180 Fed. 739, 105 C. C. A. 37, as to the substitution of rubber for metal in garters; in Smith v. Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952, as to the substitution of vulcanite for materials theretofore in use in the manufacture of dental plates; in Fairbanks Wood Rim Co. v. Moore (C. C.) 78 Fed. 490, in the substitution of wood

bicycle wheel rims for metal; in Badische Anilin & Soda Fabrik v. Kalle, supra, where the essence of the invention consisted in the discovery that by prolonged washing sapanineazo-napthol became soluble in water and adaptable to a new use. The same principle is upheld in Potts v. Creager, 155 U. S. 597–606, 15 Sup. Ct. 194, 39 L. Ed. 275; Wickelmann v. Dick Co., 88 Fed. 264, 31 C. C. A. 530; Edison Electric Light Co. v. United States Electric Lighting Co., 52 Fed. 300, 3 C. C. A. 83; Celluloid Co. v. Zylonite Co. (C. C.) 35 Fed. 301; King v. Anderson (C. C.) 90 Fed. 500.

If this discovery is to be judged by its contribution to the electrical art, it is entitled to be held to be measurably broad within certain lines, and as such entitled to a reasonable degree of equivalents—not necessarily equivalency as found in chemical structures but, as was said in Treibacher Chemische & Werke, etc., v. Roessler & Hasslacher Chemical Co., supra, equivalency in "functional efficiency."

Appellant's calorite consists in substance of appellee's alloy plus 15 per cent. of iron and 8 per cent. of manganese. It will be remembered that the patent specification says:

"Iron, on the other hand, is readily oxidizable and will not answer my purpose when alloyed with a metal of the chromium group."

Placet speaks of the beneficial effect of an alloy consisting of chromium and ferro-nickel. Appellant claims to have brought itself within this alloy and within appellee's alleged abandoned claim 4. But Placet's alloy contained not less than 56 per cent. of iron. It is evident that appellee was advised of the tendency of iron to oxidation. While possessed of high resistivity and high melting point, its duration at 1000° C. is only nine minutes. Manifestly, in looking for an element possessing high specific resistance, he was awake to the necessity of such an element as had also the property of high durability. Very naturally he did not want a metal which endured at 1000° C. for only nine minutes. We deem it a fair deduction from the evidence that Marsh was not thinking of a diluent of iron, but of iron as a substitute for nickel, as a body for his alloy. From the record it appears that for the purposes of an all round element of great specific resistivity, including the essential companion property of endurance or resistance to the encroachment of high temperature, etc., 15 per cent. of iron has no appreciable effect on a chromium and nickel alloy. Iron was supposed to increase the quality of ductility. Manganese was supposed to aid in deoxidation and refining. These elements were added to appellant's alloy, after it had analyzed two specimens of appellee's material and seem to have been added in the attempt to bring calorite within the Placet description and to avoid infringement of Marsh; but as above stated, Placet's ferro-nickel alloy contained 56 per cent. iron. For all practical purposes for use in electric heating and cooking appliances and other devices employing high temperatures, the two resistance elements are equivalent. The object in increasing ductility was for the purpose of facilitating the process of drawing the alloy into strips, filaments, etc. As a matter of fact, appellant's resistance material is to all intents and purposes identical with that of appellee's. Its resistivity, durability, melting point, temperature co-efficient, re-

sistance to oxidation, ductility, and appearance, practically coincide with that of Marsh. Appellee's element is sufficiently ductile for the uses to which it is put, as shown by the Hansen diagram above alluded to. The 15 per cent. of iron is apparently lost, while the manganese makes no impression. Thus it is apparent that iron and manganese serve no purpose other than as diluents and as fictitious bases upon which to construct a claim for nonmeritorious distinctions between the composition of the two alloys. Neither composition is new. When applied as electrical resistance elements, the results are identical, as is the appearance of the two. There is no other dissimilarity than the presence of small and inconsequential ingredients of iron and manganese in appellant's alloy. The new use is the same.

It is charged by appellant's counsel that Marsh's claim of more than 50 per cent. nickel and less than 50 per cent. chromium leaves the situation more obscure than Placet did. The latter's second claim reads, "The products which result from the mixture of pure chromium with metals and alloys." Inasmuch as Marsh is not claiming novelty for his alloy as such, we need not give the objection further attention, except to note that Marsh's specification gives the more detailed proportion desirable in forming the alloy, to such as desire it. These come within the claims. In his evidence Marsh recommends two alloys, one consisting of 80 per cent. nickel and 20 per cent. chromium, the other 80 per cent. nickel approximately, and 20 per cent. chromium, to which he adds 2 per cent. aluminum for particular manufactures. These appellee terms its standards.

Some question is raised by appellant as to the relative merits of binary and ternary alloys. It appears in the record that the highest resistivity of ternary alloys as tested was 120 microhms, while the resistivity of a binary alloy reached 128 microhms, so that it is evident that there is no merit in the point that ternary or quarterney alloys exceed in efficiency for the purposes of this hearing a binary alloy.

We are clearly of the opinion that appellant's use of the alloy is an infringement of the Marsh patent and should be restrained.

The decree of the District Court is affirmed.