### ORIENTAL TISSUE CO. v. LOUIS DE JONGE & CO.

(District Court, S. D. New York. January 11, 1916.)

1. PATENTS ⊂⊃328—VALIDITY AND INFRINGEMENT—IMITATION GOLD LEAF.

The Gregory patent, No. 848,301, claim 2, for "a thin leaf or fabric composed entirely of soluble cotton and a coloring matter incorporated therein," designed to take the place of gold or other metal leaf for embossing and decorative purposes, was not anticipated, discloses invention, and the product is highly meritorious; but the claim is not infringed by a product containing a third ingredient, which is not merely an addition, but serves a useful purpose.

2. PATENTS ⊂⊃168(2)—CONSTRUCTION—ACQUIESCENCE IN LIMITATION BY PATENT OFFICE.

A patentee, who narrowed his claims to meet objections by the Patent Office, cannot have what he eliminated restored by construction, for the purpose of making out infringement.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 244; Dec. Dig. ⊂⊃168(2).]

In Equity. Suit by the Oriental Tissue Company against Louis De Jonge & Co. On final hearing. Decree for defendant.

Brown & Seward, of New York City (E. Clarkson Seward and Wm. McK. Barber, both of New York City, of counsel), for plaintiff.

Seward Davis, Drury W. Cooper, and Charles E. Wilson, all of New York City, for defendant.

MAYER, District Judge. [1] In a suit between these same parties, involving this same claim 2, the patent was held valid and infringed. 218 Fed. 170, 134 C. C. A. 50, affirmed 218 Fed. 173, 134 C. C. A. 50.

The present case involves a new imitation gold leaf. It will be recalled that claim 2 reads:

"A thin leaf or fabric composed entirely of soluble cotton and a coloring matter incorporated therein."

Plaintiff contends: (1) That the patent discloses a meritorious and pioneer invention; (2) that defendant's leaf infringes, under the doctrines of (a) addition and (b) equivalents. Defendant contends (the previous decree being still interlocutory): (1) That the patent is invalid for lack of invention and for inoperativeness; and (2) not infringed because defendant's product is not composed *entirely* of the elements set forth in the claim.

The value of the patent commercially is in its having pointed out how to make an imitation gold leaf which is now extensively used in place of the genuine gold leaf in stamping book covers; but the specification was not limited to this use solely, for Gregory said:

"My invention consists in providing a thin leaf of fabric which is made to imitate metal leaf—such, for instance, as gold leaf, silver, lead, and the like—which thin leaf or fabric is suitable for use in embossing and decorative purposes generally; it being extremely tenacious and capable of being more easily handled than the gold or other metal leaf itself."

Therefore the citable prior art will include patents relating to embossing and decorative purposes. The added prior art in this case does not change my conclusion as to validity, for I think now, as I did in the prior case, that Gregory's product shows invention and is highly meritorious; and, if any one entertained any doubt, the proven commercial utility would resolve the doubt.

True, the Oeser leaf (more fully testified about in this case) has had a considerable commercial use, but only for inferior work, and one need not be an expert to know that the Oeser is not in the same class with either the Oriental or the De Jonge leaves here in controversy. I may also state, for the information of counsel, that assuming, but not deciding (because unnecessary so to do), that the documentary evidence relating to the applications for patents in foreign countries is admissible, those proceedings, in my opinion, amount to nothing more than an effort to make the best argument possible in foreign jurisdictions to meet points of view, governmental attitude, and departmental interpretations which may be, at least in some respects, different from ours.

The contention as to invalidity because of inoperativeness rests on the proposition that "amyl oil" (which is amyl alcohol), referred to in the patent as a solvent for soluble cotton, is not such a solvent. Of course, amyl acetate is. This seems highly technical, because I think the skilled man would at once understand that amyl acetate was meant, as is clearly stated by Dr. McIlhiney on page 681 of the previous record, when he says:

"By 'amyl oil' I understand him to mean amyl acetate, one of the most common solvents for soluble cotton, and one which is commonly referred to as amyl oil."

But while, on the prior art and all that this record contains, the patent must be held valid, yet the scope of the claim cannot be stretched so as to exclude every third element, when the claim contains only

two. It is therefore necessary to ascertain what was heretofore decided in respect of claim 2. In the previous case, I supposed that what Gregory had found out was how to produce a self-supporting imitation gold leaf by the combination of two elements: (1) Soluble *cotton;* and (2) *coloring matter.* This seemed to me ingenious, comparatively simple and economical, and therefore a real contribution, and in construing the claim I said, and now repeat:

"The most serious question is that of infringement. There is a sharp dispute as to the meaning of the claim; but the claim is stated in simple language and in connection with the context I think its interpretation is plain. 'Coloring matter' means, of course, coloring matter which will produce the imitation leaf desired. 'Entirely' means the absence of any ingredient which is foreign either to soluble cotton or the appropriate coloring matter."

On the evidence in that case I found as a fact that commercial soluble cotton, bought in the regular course of trade, contained, among other things, "gums and resins with the properties of gum sondrac, gum mastic, and common resin among the solids," and therefore I concluded that the per cent. found in plaintiff's leaf was natural and to be expected in soluble cotton after it was subjected to the process described in the patent. I was also impressed with the testimony of Dr. Carmichael, plaintiff's expert, that only a fraction of 1 per cent of gum mastic was found in defendant's leaf, and that this third element was merely an addition, introduced for specious purposes to avoid the patent. The Circuit Court of Appeals seems to have adopted my views, and, in any event, my conclusion, adding:

"Claim 2, taken literally, would cover products made by these earlier patents, and referring to Berard, Abel and Stevens, and Lefferts, and, so construed, would be invalid as too broad. It is, however, to be construed in connection with the specifications, and with what the patentee describes to be, and what we find actually was, his invention, viz. a thin metallic leaf, an article which is not shown to have been anticipated."

It is therefore apparent that the word "entirely" is of much importance, and especially on the evidence in this case. An examination of the file wrapper shows claims which at one stage read:

"2. A thin leaf or fabric *comprising* soluble cotton and a coloring matter."
"4. A thin leaf or fabric *comprising* soluble cotton and bronze."

These claims were rejected; the examiner stating that it would not involve invention over the disclosure of the prior art to color the leaf. Thereupon the claims were canceled, applicant stating:

"Applicant has canceled the claims against which the Eichengrun et al. patent was cited, and has substituted therefor a new claim 2, calling particular attention to the fact that applicant's thin leaf or fabric is *composed entirely* of soluble cotton and a coloring matter incorporated therein."

"Composed entirely," of course, does not mean "comprising" or "consisting of." See any dictionary.

[2] The principle of construction and interpretation here to be applied is concisely stated by Judge Townsend in Victor Talking Machine Co. v. American Graphophone, 151 Fed. 601, at page 604, 81 C. C. A. 145, at page 148:

"The applicant for a patent is entitled to specify and claim in his application the subject-matter of which he believes himself to be the original inventor, and to persist in his assertions and claims until final action thereon

by the Patent Office. But when his claims are rejected on references cited against them, he is called upon to exercise his election between insistence and appeal or desistance and acquiescence. And while the language of the patent as issued may not be contradicted by mere voluntary expressions of opinion, or argumentative suggestions made by the applicant in his communications to the Patent Office, especially where no change is made in the claims, and while a patentee is entitled to the benefit of such equities as may be properly raised in his behalf from the transactions disclosed in the file wrapper, yet, on the other hand, the public is interested in securing due limitations upon the claim of an exclusive monopoly on the ground of patentable novelty, and is entitled to the benefit of admissions imposed upon the applicant as a condition precedent to the allowance of the patent. * * * 'Undoubtedly a patent, like any other written instrument, is to be interpreted by its own terms. But when a patent bears upon its face a particular construction, inasmuch as the specification and claim are in the words of the patentee, it is reasonable to hold that such a construction may be confirmed by what the patentee said when he was making his application. The understanding of a party to a contract has always been regarded as of some importance in its interpretation.' Goodyear Dental Vulcanite Co. v. Davis, 102 U. S. 222, 227, 26 L. Ed. 149. * * * While, therefore, an applicant for a patent may stake out the boundaries of his territory, yet if, upon notice from the Patent Office that some portion of said territory is the property of another or is held in common by the public, he acquiesces in such statement and alters his boundaries accordingly, he is concluded by such abandonment, and cannot afterward undertake to define his territory by rolling stones, which he may move about across the lines of his original boundaries so as to appropriate property previously conceded to belong to others."

The facts in the present case are not seriously in dispute. The evidence now satisfies me that "soluble cotton" has long been sold commercially in two forms. Assuming chemically pure soluble cotton as represented by 100 per cent., these forms are, as to purity:

(1) Soluble cotton, 99+ per cent. pure; that is, cotton after treatment by nitric and sulphuric acid, and usually moistened with water, for safety.

(2) Solutions of soluble cotton, 98.45 per cent. pure, and formed by dissolving pure soluble cotton in amyl acetate.

The addition of other constituents in substantial amounts causes the substance to be called by a different name and to be a different compound, such as "bronzing liquid," etc.

Plaintiff's expert, Prof. Carmichael, analyzed the defendant's leaves, "Complainant's Exhibit 5," as follows:

Bronze ........................................86.12%
Cotton .......................................... 5.21% } or 13.88% binder
Gums, oils, and resins............................ 8.67%

Defendant's expert, Dr. McIlhiney, analyzed defendant's leaves as follows:

Bronze ........................................80.36%
Cotton .......................................... 6.94% } or 17.97% binder
Gum, etc.......................................11.03%

Upon the basis of these analyses the two expert witnesses are in practical agreement, since, considering the substances other than bronze as 100 per cent. binder, we have

|  | Carmichael | McIlhiney |
|---|---|---|
| Pure Cotton ........................................ | 37.53% | 38.62% |
| Gum, etc.......................................... | 62.46% | 61.38% |

The Carmichael percentages for binder just given are afforded, respectively, by his ratios of the gum, 8.67 per cent., to his total binder, 13.88 per cent., and of the cotton, 5.21 per cent., to the total binder, 13.88 per cent.

Complainant is reduced to the necessary contention that commercial soluble cotton "includes everything in the leaf except bronze." The contention is contradicted by the evidence of the undisputed fact that both parties to this litigation purchase from the Bloomfield Chemical Company, as their leaf-forming solution, the same commercial soluble cotton, known as "B. M. Lacquer"; that this solution is identical as to solvents and differs only in the amount of contained soluble cotton.

This solution was analyzed by Dr. McIlhiney, and consists of 3.59 per cent. soluble cotton dissolved in a completely volatile solvent, in which there is less than 1 per cent. of impurities, namely, 1.55 per cent. of 3.59 per cent.—i. e., .055 of 1 per cent.—impurity. If the bronze powder contains .7 of 1 per cent. of impurities of the bronze entering into defendant's leaf, according to Carmichael, or .24 of 1 per cent., according to McIlhiney, the percentage of impurity to be expected in a leaf composed entirely of "B. M. Lacquer" and "Bendalin Finest Pale Gold" would be less than 1 per cent., namely, 0.55 of 1 per cent., on Dr. Carmichael's analysis.

This would be a leaf "composed entirely of commercial soluble cotton and bronze." But it is not defendant's leaf, in which is found at least 8.67 per cent. gum, or at least 15 (as 8.67 to 0.55) times the amount of these expected impurities of commercial soluble cotton. The third ingredient of defendant's leaf is not an impurity, but an added gum, known in the art as "elemi." According to the formula of the composition of defendant's leaf as established February 4, 1915, by Olson, Orme, and Nelson, it is: Bronze, 73 per cent., elemi, 18 per cent., and cotton, 9 per cent. All leaf made by Olson from February 4, 1915, to the date of this suit, has been made pursuant to this formula, and his entire output has been sold to defendant, which has sold only this leaf and the Oeser leaf since November, 1914.

The apparent difference between the synthesis of defendant's leaf and its analysis is explained by Dr. McIlhiney to be due to the variation of the mixture in the mixing tank, by the settling of the heavier bronze. The ingredients of the leaf are mixed according to the established formula, and the volatile solution in which they are suspended is sprayed upon glass plates, from which the solvent evaporates, leaving the leaf to be stripped. No exterior coating of size is applied. The elemi gum is thus incorporated with the bronze and cotton in the leaf. Dr. McIlhiney found three-quarters of the gum inside the leaf and one-quarter on the outside. Prof. Carmichael admitted that an amount of the binder equal to 3.67 per cent. of the entire leaf is inside the leaf. Microscopically, the leaf is a uniform leaf with a uniform binder. Carmichael admitted that any difference in the appearances of the leaf is due to the difference in working the process of manufacture, but that the bronze is unevenly distributed. He further admitted that resin becomes a cementing substance in the leaf.

Defendant has shown that the manufacturer of its leaf, Olson, pur-

chased from McKesson & Robbins and used 600 pounds of gum elemi, which he mixed with 300 pounds of soluble cotton, in making leaf from February 4 to June 15, 1915. The addition of gum elemi, in the quantities given, serves a useful purpose. From the manufacturer's point of view, the utility of the incorporated elemi in defendant's leaf is twofold: First, it effects a saving in cost over soluble cotton; and, second, it facilitates the process of manufacture by delaying the drying of the film. The cotton costs $1.50 per gallon of solution containing four ounces, or $6 per pound. The elemi costs 20 cents per pound.

Various advantages are claimed by defendant. It is enough to state that on the evidence it is established that on most cloths the leaf blocks without size. From the foregoing it appears: (1) That the impurities from soluble cotton are far less than the per cent. of gum elemi; (2) that the gum elemi is a third element, which is incorporated in the product, and not merely a trifling addition thereto; (3) that the gum elemi has at least one real and important advantage.

In this connection, and to avoid use for advertising purposes, I am not to be understood as expressing any opinion as to which is the better article—Oriental or De Jonge. That they can argue with their customers. I am referring merely to "advantage" in its relation to the questions of law and fact here concerned.

In view of the prior art (see, inter alia, Wilson, British, 491 of 1885, and Jacob, 2484 of 1878), and remembering that it was old to add gums and resin to other ingredients, the claim cannot be expanded, either on the theory of addition or equivalency, to mean "comprising" or "consisting." Of course, "soluble cotton" as an element is of major importance; but I think the courts went as far as they could to protect a meritorious patent when they gave "entirely" the elasticity they did in the previous case. If 8 to 11 per cent. of elemi and 5 to 7 per cent. of cotton (speaking in round numbers), with the coloring matter, come within the claim of the patent, where will we stop? How about 15 per cent. of elemi and 1 per cent. of cotton, for instance?

Of the cases cited by plaintiff, General Electric Co. v. Hoskins Mfg. Co., 224 Fed. 464, 140 C. C. A. 150, is a good example. In that case an element was described as *"formed of"* an alloy *"consisting of"* nickel and chronium." In Treibacher v. Roessler (D. C.) 214 Fed. 410, the claim read an alloy *"containing"* cerium alloyed with iron." But no case has been cited which, with or without a file wrapper history like this, defines "composed entirely" as meaning plus something else which is a useful and not merely additive ingredient.

For the reasons outlined, the patent is held valid, but claim 2 is not infringed, and therefore a decree will pass dismissing the complaint, with costs.