## DOVAN CHEMICAL CO. v. CORONA CORD TIRE CO.

(Circuit Court of Appeals, Third Circuit.
December 7, 1926. Rehearing Denied
January 26, 1927.)

No. 3470.

1. **Patents** ⟳112(1)—Regularly granted patent is prima facie evidence of its validity.

Patent regularly granted is prima facie evidence of its validity.

2. **Patents** ⟳328—No. 1,411,231, for acceleration of rubber vulcanization, held valid and not anticipated.

Weiss patent, No. 1,411,231, for acceleration of rubber vulcanization, *held* valid and not anticipated.

Woolley, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Pennsylvania; Robert M. Gibson, Judge.

Suit by the Dovan Chemical Company against the Corona Cord Tire Company. Decree for defendant (10 F.[2d] 598), and plaintiff appeals. Reversed.

Fraley & Paul, of Philadelphia, Pa. (John W. Davis, James M. Nicely, Julian S. Wooster, and James J. Kennedy, all of New York City, of counsel), for appellant.

Dean S. Edmonds, Frank E. Barrows, and Raymond F. Adams, all of New York City, for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This case concerns the acceleration of rubber vulcanization. As the patent here involved and the art to which it appertains has been set forth at length in an opinion reported at 292 F. 555, a case in the Second Circuit involving the same patent, and also in the exhaustive opinion of the court below in this case, reported at 10 F.(2d) 598, we avoid repetition by referring thereto. The proofs show that Morris L. Weiss, the grantee of the patent here involved, was a chemist employed by a rubber company. During the course of his work, and moved by a suggestion in Richter's Chemistry, Weiss, in March, 1918, conceived the idea that a well-known laboratory product, diphenylguanidine, known by the chemical symbol D. P. G., and listed by Richter but not as an accelerator, might be used in accelerating the vulcanization of rubber, and then so told Carlton, the chief chemist of the factory. The chemical properties of D. P. G. as a laboratory element were of course known as an abstract truth, but no one prior to Weiss seems to have conceived and worked out any practical plan by which D. P. G.'s potential powers could be commercially used. The reason for this is plain, for no one knew, or, for that matter, had tried to learn, how D. P. G. could be produced in such quantity as to make possible its commercial use.

Having conceived the general idea and made at the factory where he was employed some recorded laboratory experimental work under various dates, Weiss took up the problem of trying out D. P. G. as a vulcanizer and of devising some way to make D. P. G. in such quantity that it could be practically used commercially. The problem was untried and difficult. He first set about making laboratory D. P. G., and in September, 1918, Weiss had produced five grams, which by December he had tested with the ordinary rubber batches, and found it powerfully accelerated, but the rubber product was overcured. However, he was encouraged by them, and shortly thereafter his experiments resulted in a perfect cure, which was recorded in an experimental book under date of February 10, 1919, a date which, as we shall hereafter see, is challenged as being changed to that date from September 10, 1919. Under date of February 21, 1919, another successful test, this time with a shoddy compound, was entered in the same book, and another with shoddy on March 4, 1919. These experiments proved the workable worth of D. P. G. as an accelerator in vulcanizing rubber, but Weiss stopped working further in that line, as his supply of D. P. G. had been exhausted. He then turned his attention to discovering some way to make D. P. G. commercially. His efforts in that line resulted in his discovery disclosed and practically utilized in the patent in suit. We here note that he was told he could not get a patent for an accelerator, but, later on, finding he could patent his original discovery, he applied on November 12, 1921, for a patent thereon, and on March 28, 1922, was granted the patent in suit, No. 1,411,231.

[1] This patent, regularly granted, under the authorities, is prima facie evidence of its validity, and, unless successfully challenged, warrants a decree in this case, as infringement is clear. Such attack is here made, and is based on two grounds, viz.: First, denial of patentable invention; and, second, that, if patentable, Weiss was not the original inventor thereof.

[2] Addressing ourselves to the question of patentable invention, we find ourselves in accord with the Patent Office's action in the grant of the patent. In the first place, the worth of D. P. G. as an accelerator is evidenced in its use by the defendant, by the

mass of testimony, array of counsel, and earnest effort here very properly made to insure its continued use by. this litigation. Its use has been extensive in the art; it has reduced the time of vulcanization, obviated overcuring, and increased the character and worth of the product. These elements, while not conclusive, are evidential of its worth in the art. Assuming for present purposes the prima facies of Weiss' patent stands, and the statement in his specification, "I have discovered that disubstituted guanidines, particularly diphenylguanidine, is particularly effective for this purpose," is true, and if he showed the world in addition how to make this product in commercial quantity in the rubber vulcanizing art, it would seem to us, and we so hold, that a claim, such, for example, as his eighth, viz., "The process of treating rubber or similar materials, which comprises combining with the rubber compound a vulcanizing agent and diphenylguanidine," was inventive in character and valid.

In that regard we agree with Judge Manton's holding, when this patent was before him in the Second Circuit, that it involved invention, viz.: "I am satisfied that the use of diphenylguanidine, as in the plaintiff's process, involved invention. Using it advanced the art of rubber making. Its utility and the consequences which followed, fully support the real practical test of the sufficiency of an invention. Where the utility is proved to exist in any degree, a sufficiency of invention to support the patent must be presumed. Smith v. Goodyear, 93 U. S. 486 [23 L. Ed. 952]. This substitution involved a new process of manufacture to develop a new use of the properties of diphenylguanidine and there was a new and useful result obtained. See Smith v. Goodyear, supra; Rumford Chemical Works v. N. Y. Baking Powder Co. [C. C. A.] 134 F. 385; Genl. El. Co. v. Hoskins Mfg. Co. [C. C. A.] 224 F. 464."

The process, then, being new, useful, and inventive in character, it remains to inquire whether the prima facies of inventorship which the patent vested in Weiss is overcome by proof of the standard the law requires, that some one else was the inventor thereof. Turning, then, to the patent, to see what Weiss disclosed and, consequently, what alleged prediscoverers must convincingly prove they had discovered and disclosed before him, we note the specification states generally:

"The object of my invention is to improve rubber compounds, so that the finished product shall be of superior quality, and so that the time required for vulcanization shall be greatly reduced over that ordinarily required for such purpose. * * * I have discovered that disubstituted guanidines, particularly diphenylguanidine, is particularly effective for this purpose. *. * * Down to the time of my researches in accelerators of this type, it was apparently not known that disubstituted guanidines were efficacious or useful as accelerators in vulcanizing, nor that this substance could be produced in sufficiently large quantities, in a substantially pure form, or at a sufficiently low cost to be available for this purpose."

The specification then states that in another patent, viz. serial 482,143, he has disclosed "a process for producing and purifying diphenylguanidine in commercial quantities," and after disclosing fully how, in what proportions, and under what heat conditions the D. P. G. was to be used, Weiss set forth desirable results thereby obtained, viz.:

"It will therefore be appreciated that, when using the accelerator according to my invention, the vulcanization is accomplished by using comparatively small quantities of the accelerator, thereby obviating undesirable loading or adulteration of the rubber compound. Furthermore, by the use of such accelerator, the texture and durability of the final product is greatly improved, and the tendency commonly present in vulcanized rubber to bloom and become brittle with age is greatly reduced, if not entirely obviated. My improved accelerator is particularly useful and valuable, where it is desired to produce a harder or less elastic portion in an article, leaving other parts which are required to be more elastic and flexible, such as in automobile tires, where the beadstock is usually made harder than the body or carcass of the tire proper. The relative amounts of vulcanizing agent and accelerator may be so proportioned that the various parts of a single article may be cured to different degrees of hardness without danger of overcuring the softer or more elastic parts."

It will thus be seen that, summarized, Weiss' claim of invention was, first, that no one before him had known that D. P. G. was efficacious or *useful* as an accelerator in commercial vulcanizing; second, no one had known that D. P. G. could be produced in quantity, in pure quality, or at a cost to permit its use in vulcanizing; third, that Weiss was the first to solve this second problem by his patent No. 482,143; fourth, that the solution of this second problem enabled him, for the first time in the rubber vulcanizing art, to commercially use D. P. G.

Without entering into details and a discussion of the proofs, we may say they satis-

fy us that Weiss was the first to instruct the rubber art in this mode of rubber vulcanization, and that up to his work the rubber art had made no use of D. P. G. in vulcanization, and no one had theretofore disclosed to the art, or instructed it how D. P. G. could be practically produced, or, of course, practically used. As showing the foremost advance, knowledge, and practice in the rubber art in that regard, we take the exhaustive paper prepared by Dr. G. D. Kratz and his associates, and read by him on September 2, 1919, at a meeting of the American Chemical Society in Philadelphia, and published in April, 1920, in the Journal of Industrial and Engineering Chemistry.

We feel justified in regarding this paper as evidencing, not only the highest point of advance by the art in general, but the highest point reached by the three men in their individual prior research and practical results attained. Here was a convention of the leading scientific minds of the rubber industry; here was an opportunity to disclose an invention of vast importance to that art, if it had been made, and to give the public instructions in a novel and untilled field, and in that field barren of any attempt to use D. P. G. Therefore, to assert inventive priority and to foreclose all subsequent claimants of invention in that regard, by there announcing and showing the thing had been done, was now disclosed, and the art enabled to now use D. P. G., was an opportunity not to be neglected,

Assuming for present purposes that Dr. Kratz and his associates had conceived the idea of the practical and commercial use of D. P. G. in the rubber art, did this paper so state? Conceiving they had devised some way to make D. P. G. commercially, did the paper tell the art how it could be done? That the paper did not give such information is clear. A contemporaneous report of the meeting and the paper in question, made to his company by Williams, a chemical representative of a rubber company, who attended the meeting, may be taken as illustrative of the effect it made on the most highly skilled minds in the art, for, after giving an analysis of what the paper meant to him, in which we find no such disclosure as Weiss made in his patent, Williams adds: "The symposium on the action of accelerators which followed was unimportant, as every one seemed to try to conceal all he knew on the subject, but obtained all the information possible from others." And indeed that withholding of information from the rubber art, and not disclosure of a workable advance, was the very purpose of the paper of the authors, and was testified to by one of their number, who said:

"We absolutely had no intention of giving any information which any other company or competitor could transpose directly for practical purposes. Our idea, however, did give enough information, so that any reputable chemist would be guided by the information in the paper.

Q. Guided to the extent of being put on inquiry, to find out for himself anything you did not say—is that right? A. Guided to the extent of stimulating investigation along the same lines with which we were pioneering.

"Q. And without telling him what to investigate? A. No, sir. We gave him two tables of what to investigate.

"Q. But, I mean, you did not tell him any specific substance to investigate? A. Well, we gave him two tables of substances, which we pointed out were excellent accelerators.

"Q. And he could take his choice from any one of the substances mentioned in the two tables? A. Absolutely.

"Q. And go on investigating for himself? A. Yes, sir; because there is no one accelerator of universal application or universal quality."

And this estimate by Dr. Kratz of the purpose of the paper, namely, an invitation to experimental research, is evidenced by what influence the paper had in the case of Weiss personally. Daniels, who was Weiss' chief, attended the meeting in Philadelphia and took notes of the tables in the paper, and on his return, as he testified, he did "immediately tell Weiss that the statements made in the paper read by said Kratz confirmed our experience with D. P. G. as to accelerating, and that we should continue to work on that substance and develop a commercial process, if possible."

It will thus appear that the paper of Kratz and his associates had no effect on the working art. No one made any practical use of it. No one in the art selected D. P. G. from the several accelerators named in its tables, and used it in the vulcanization of rubber. No special emphasis was laid on D. P. G. in comparison with other substances so named, and it is quite evident that, if advance in the art had stopped with the Philadelphia paper, the art would not have had the information and advance disclosed by Weiss in his patent specification, and would not have made the successful advance which followed Weiss' disclosure. Such being the negative results produced by the paper, we cannot accede to the proposition that its theoretical statements, valuable as they were, forestalled or even foreshadowed the clear-cut, practical conception which Weiss then purposed, and which he later practically worked out, namely, the

successful pioneer making of D. P. G. commercially, and, when made, successfully and pioneeringly using it in the rubber vulcanizing art.

In arriving at the conclusion that the prima facies of Weiss' patent has not been met, we deem it proper to say that, while we have not discussed, we have not overlooked, the many other matters disclosed in the proofs, and argued by counsel. We have only discussed what we regard as its decisive features, but we deem it proper to say, without discussing the evidence, we have reached the conclusion that the time date of entry by Weiss in the experiment book was February 10, 1919, as contended by the plaintiff, and not September 10, 1919, as contended for the defendant. We deem it proper to say, also, that we have not discussed the technical contents of the Philadelphia paper for two reasons: First, our technical inability to do so; and, second, the needlessness of doing so, had we been able, because, for the purposes of this case, we have the evidence of its reader, uncontradicted by his associates, that its purpose was not to disclose a useful, workable process, but, on the contrary, not to do so.

In reaching the conclusion we have, we regret to find ourselves at variance with those reached by two Circuit Judges of the Second Circuit, reported at 292 F. 555, heretofore referred to; but such regrettable divergence of view is lessened by the fact that the views of two other Circuit Judges of that circuit are in accord with our own.

So holding, the decree entered below will therefore be reversed, and before the mandate goes down an opportunity will be given counsel to agree as to its form.

WOOLLEY, Circuit Judge, dissents.