SCOVILL MFG. CO. v. BALISTOCKY et al.

No. 4961.

District Court, E. D. Pennsylvania.

April 8, 1931.

John P. Croasdale, of Philadelphia, Pa., Philipp, Sawyer, Rice & Kennedy, H. M. Humason, and M. C. Massie, all of New York City, and Thomas G. Haight, of Jersey City, N. J., for plaintiff.

Harry Balis, of Philadelphia, Pa., A. D. T. Libby, of Newark, N. J., and Clifton V. Edwards, of New York City, for defendants.

THOMPSON, District Judge.

This is a suit in equity brought by the Scovill Manufacturing Company against the defendants, trading as Post Radio Company, for an injunction and for damages for alleged infringement of patent No. 1,258,423, issued to Fritz Lowenstein on March 5, 1918, upon an application filed August 10, 1916, which is a division of an earlier application filed June 28, 1910. The defenses are noninfringement and invalidity because of lack of invention and also by reason of anticipation.

The patent in suit, which is owned by the plaintiff under mesne assignments, relates to variable electrical apparatus and more particularly to condensers adapted for use in wireless or radio work. The patent was in suit in the district of Connecticut. Judge Thomas sustained the validity of claims 1, 2, 3, and 4. See Scovill Manufacturing Co. v. Satler (D. C.) 21 F.(2d) 630.

No clearer description of variable condensers and of the condenser of the patent could be given by the writer than the following statement by Judge Thomas, including his observations on the meaning of claims 1, 2, 3, and 4:

"The invention of the patent in suit relates to variable condensers adapted for use in radio or wireless work. Broadly defined, a condenser comprises a plurality of surfaces insulated from each other, which afford an area on which an electrical charge is stored. The invention of the patent in suit is more particularly directed to that type of electrical condenser which comprises a set of stationary spaced metal plates and a series of movable spaced metal plates; the latter being adapted to be interspersed to a greater or less degree between the stationary plates to effect changes in the capacity of the condenser.

"In the most commonly known variable electrical condensers of the type mentioned, both sets of plates are semicircular; the stationary plates being separated from each other a uniform distance, while the movable plates, which are mounted on a rotatable shaft, are also separated a uniform distance from each other in absolute parallelism. The layers of air between juxtaposed surfaces of the plates constitute the insulating medium or dielectric of the condenser. The dielectric prevents an electrical charge which is collected on the juxtaposed surfaces from jumping across and thus short-circuiting and rendering the condenser useless. The ability of a condenser to store electrical charges is known as capacity, which is measured in micro-microfarads, which in turn is one-millionth of a millionth of a farad; the farad

being a very large unit. The capacity of a condenser depends directly on its area, so that area and capacity are equivalents in speaking of condensers.

"In the condenser just described, the change in area of the movable plates active between the stationary plates is always the same for equal angular movements of the shaft, with the result that for a given angular movement of the shaft there will be the same increase or decrease of capacity throughout the range of movement of the movable plates, no matter where that movement may be made. The movable plates turn through an angle of 180°. In other words, this variable condenser is so designed that equal angular movements or displacements of the movable plates within the working range of the instrument produce unequal percentage variations in capacity.

"The main object of the invention described in the patent in suit is to so design the instrument, for a purpose hereinafter described, that a given angular displacement of the movable plates produces substantially the same percentage change in capacity at any point within the range of the instrument. The condenser described in the patent in suit includes, preferably, a set of semicircular stationary condenser plates 14, supported in parallel relation by rods 15, which depend from a cover plate and are clamped thereto by nuts 16 and 17. The stationary condenser plates are uniformly spaced apart by collars 18. The parallel movable condenser plates 21a are secured to a central vertical shaft 22, which is supported at its lower end on a pivot 23 and is held at its upper and in a bearing 24 in the cover plate. Spacing collars 25 are provided to maintain the plates 21a the proper distance apart, and they are securely clamped in position between nuts 26 and 27. The relative positions of the fixed or stationary plates and the movable plates are such that, when the central shaft is turned, the movable plates enter the spaces between the fixed plates. The movable plates, with the exception of five at the top of the set which are of equal size and a little more than semicircular, are cut off at angles which are progressively greater from the top downward. As a result, the edges of the movable set of plates are arranged in step-like fashion, so that the movable plates enter successively between the stationary plates as the shaft is turned. The proportioning of the plates and their arrangement is such that the capacity of the condenser is variable, following substantially the law of geometrical progression or in accordance with a logarithmic law fully set forth in the specification of the patent in suit. It is due to such proportioning and arrangement of the plates that a given angular displacement of the movable plates produces substantially the same percentage changes in capacity at any point within the range of the instrument and that the change in capacity is much more gradual than in a condenser where both sets of plates are semicircular.

"For the purpose of understanding the invention described and claimed in the patent in suit, it is sufficient to note that the band of frequencies assigned to various radio broadcasting stations in the United States is from 500 kilocycles to 1500 kilocycles, and that the difference between the frequencies of successive stations in the United States is assumed to be 10 kilocycles so as to prevent the sendings of the various broadcasting stations from interfering with each other. Broadly speaking, the condenser is used to separate the frequency of one station from another in tuning, and it is obvious that the frequency on which one broadcasting station operates should not be so near to the frequency of another station that the condenser cannot separate one from the other. Considering now the action of a semicircular plate condenser, it is to be noted that the changes in the amounts of capacity required for a given change of frequency when tuning in that range of the condenser which covers the high frequencies and short wave lengths are much less than when tuning in that range of the condenser which covers the long wave lengths and low frequencies. If it is assumed that the movable plates are fully within the stationary plates, the condenser is then in condition to give the greatest amount of capacity. Then it may be assumed that we are tuning for a frequency of, say, 500 kilocycles, which is the longest wave length and lowest frequency of the band used in the United States. If now we decide to pass from a station operating on a frequency of 500 kilocycles to a station operating on 510 kilocycles, the amount of capacity required will call for a movement of about 7° of the movable plates of this condenser; that is to say, they must move out about 7° from the stationary plates. Assuming that we are tuned for this station at 510 kilocycles, and we now desire to tune for a station at 520 kilocycles, we will not get the required capacity if we move another 7°. As a matter of fact, the turn required will be 6.6°. If after tuning for this station at 520 kilocycles

we desire to tune for one at 530 kilocycles, the movement of the movable plates will again be less than the preceding movement. It will be 6.2°. Skipping the intermediate stations in passing from a station at a frequency of 500 kilocycles to one having a frequency of 600 kilocycles, in order to tune for this station, the movable plates of the semi-circular plate condenser would have to be moved about 55°. In other words, in tuning for the first ten stations between 500 and 600 kilocycles, 55° of the possible 180° of turn of the movable plates will have been consumed, leaving only 125° for the remaining stations. When we operate this condenser at the other end of its range—that is, the range covering the short wave lengths and high frequencies—so much of the area of the movable plates has been withdrawn from the stationary plates that only very minute movements of the movable plates can be made to give the required changes in capacity, and this operation becomes increasingly difficult and consequently increasingly ineffective. As a matter of fact, there are only 3° left of the area of the movable plates to be divided among the last ten stations; that is, the stations between 1,400 and 1,500 kilocycles. While the operation of the semi-circular plate condenser in the range of short wave lengths and high frequencies is not impossible, it requires such minute movements that its operation is extremely difficult.

"The condenser described and claimed in the patent in suit differs from the semi-circular plate condenser, because minute movements of the movable condenser plates are not required when tuning in that range of the condenser which covers the short wave lengths and high frequencies, and for the additional reason that it introduces or subtracts the plate area or capacity more evenly throughout its range. This mode of operation and result is obtained by redistributing the plate area of the old semicircular condenser in such a manner that a given angular displacement of the movable plates produces substantially the same percentage change in capacity at any point within the range of the instrument, or throughout the working tuning range.

"The plaintiff relies on claims 1, 2, 3, and 4, which read as follows:

" '1. A condenser comprising a set of stationary parallel plates suitably spaced apart, and a set of movable parallel plates adapted to enter between the stationary plates, the plates of one of said sets being so formed that a given angular displacement of the movable plates produces substantially the same percentage change in capacity at any point within the range of the instrument.'

" '2. A condenser comprising a set of stationary parallel plates suitably spaced apart, and a set of movable parallel plates adapted to enter between the stationary plates, the plates of one set being so designed and arranged with respect to those of the other, that movement of the movable plates produces variation of capacity in accordance with the law of geometric progression.'

" '3. A condenser comprising a set of stationary parallel plates suitably spaced apart, and a set of movable parallel plates adapted to enter between the stationary plates, the plates of the movable set being cut off in such manner that equal displacements of the movable plates give equal percentage changes in capacity.'

" '4. A condenser comprising a plurality of relatively movable plates so dimensioned that the change in capacity produced by a movement of the movable plates is to the movement that produced said change as C is to x in the equation

$$C = a \left( \frac{b}{a} \right)^{\frac{x}{d}}$$

where a, b, and d are constants.'

"The meaning of claims 1 and 3 is clear from the foregoing discussion of the differences between the ordinary semicircular plate condenser and the improved plate condenser described in the patent in suit. Claim 2, on the other hand, while differing in terms from claims 1 and 3, defines the same improved condenser, if we take into consideration that, in order to produce equal percentage changes in capacity of the improved condenser, the law of geometrical progression must be followed. Claim 4, on the other hand, expresses in different terms and in a mathematical formula the variations in capacity of the improved condenser."

In the instant case, the plaintiff relies also upon claims 9 and 10, which read as follows:

"9. Variable electrical apparatus comprising a fixed element and a movable element cooperating therewith to give a variable electrical value, the arrangement of said elements being such that the variations in electrical value produced by movement of said movable element follow substantially the law of geometric progression.

"10. Variable electrical apparatus com-

prising relatively movable elements cooperating to give a variable electrical value, the arrangement of said elements being such that the variations in electrical value produced by relative movement of said elements follow substantially the law of geometric progression."

Before taking up the specific issues in the case, it is pertinent to consider the history of the patent in suit in the Patent Office as it appears in the file wrapper of the parent application, filed June 28, 1910, for wireless telegraph apparatus, upon which patent No. 1,618,017 was granted February 15, 1927. In that application Lowenstein included a separate claim for a variable condenser substantially as described as in the claims in suit, which condenser was a part of the apparatus described. That claim was rejected by the Patent Office as not properly included in the application for the system described. The applicant's attorneys persistently endeavored to have the claim allowed, but the ruling of the Patent Office was that the claim was for a condenser per se, and it was only after years of discussion between the Patent Office and the applicant's attorneys that the latter finally yielded to the ruling of the Department and filed Lowenstein's divisional application on August 10, 1916.

The purpose of the invention, as derived from the specifications and claims, is to obtain accurate tuning through logarithmic change in the capacity of the condenser, whether tuning in at high frequency or low frequency within the broadcasting range. It is the contention of the defendants that, if the plaintiff's condenser is to be regarded as a condenser per se, it is not infringed, because the defendant's condenser is a gang condenser which does not come within the logarithmic rule in its variation of capacity, and because, in view of the history of the patent in suit shown by the file wrapper of the parent patent, the Lowenstein patent was for a condenser per se, that, inasmuch as the movable plates of the patented condenser are so constructed as to vary the area fixing the capacity in accordance with the logarithmic law, the condenser is not only a condenser per se, but is, as shown by the claims and description, a condenser logarithmic per se. That contention arises because the defendant's apparatus is a gang condenser composed of two condenser units operating upon the same shaft, and therefore is adapted to vary the capacity of the entire range of the receiving set, including the circuit not only of a single unit of the gang condenser, but the total circuit capacity, while it is contended that the Lowenstein patent, as shown by the drawings and the claims, takes into account only the capacity of the condenser itself.

But, in the application of the parent patent, Lowenstein says in his specifications:

"When all of the capacity of an oscillatory circuit is located in the capacity instrument the simple logarithmic characteristic is given to this capacity instrument. When a fixed capacity, however, is in series with the instrument capacity, the instrument capacity has to be given such capacity values as will in conjunction with the fixed capacity give a resultant capacity of the circuit having the logarithmic characteristic."

Those descriptive terms may be read into the later patent. A divisional application is no more than an amendment of the original application. Dwight & Lloyd Sintering Co. v. Greenawalt (C. C. A.) 27 F. (2d) 823.

It follows, therefore, that, when in series with outside capacity, the condenser in suit may be operated under the patent so that the entire circuit capacity, including the condenser capacity and the outside capacity, are varied according to logarithmic law. It is therefore, still a condenser and a condenser per se, but not a condenser per se in the sense asserted by the defendant, for it may be applied to vary logarithmically the capacity of the entire circuit with which it is in series.

While the mechanical construction of the units in the defendant's gang condenser is not identical with the plaintiff's construction, considering either one of the units singly, it is a condenser having a redistribution of area of the movable plates so that the capacity is introduced more gradually at the high frequency end than a semicircular plate condenser having the same maximum and minimum capacity and more rapidly at the low frequency end. It is a condenser that does the same thing that the Lowenstein condenser does, in that it introduces capacity gradually at first and more rapidly later.

The plaintiff relies upon the law as laid down in Winans v. Denmead, 15 How. 330, 343, 14 L. Ed. 717, where the claims of the patent described the construction of a car body as the frustum of a cone and the shape of the defendant's car body was octagonal. The Supreme Court said:

"The exclusive right to the thing patented is not secured, if the public are at liberty to make substantial copies of it, varying its form or proportions. And, therefore, the patentee, having described his invention, and

shown its principles, and claimed it in that form which most perfectly embodies it, is in contemplation of law, deemed to claim every form in which his invention may be copied, unless he manifests an intention to disclaim some of those forms.

"Indeed it is difficult to perceive how any other rule could be applied, practically, to cases like this. How is a question of infringement of this patent to be tried? It may safely be assumed, that neither the patentee nor any other constructor has made, or will make, a car exactly circular. In practice, deviations from a true circle will always occur. How near to a circle, then, must a car be, in order to infringe? May it be slightly elliptical, or otherwise depart from a true circle, and, if so, how far?

"In our judgment, the only answer that can be given to these questions is, that it must be so near to a true circle as substantially to embody the patentee's mode of operation, and thereby attain the same kind of result as was reached by his invention. It is not necessary that the defendant's cars should employ the plaintiff's invention to as good advantage as he employed it, or that the result should be precisely the same in degree. It must be the same in kind, and effected by the employment of his mode of operation in substance."

■ The application of the rule depends upon whether the plaintiff has shown by its evidence that the defendant's condenser is so constructed as substantially to embody the plaintiff's construction and mode of operation and thereby obtain the same kind of result as was reached by his invention. Quoting the opinion: "It must be the same in kind, and effected by the employment of his [the plaintiff's] mode of operation in substance."

The patent states that a principal object of the invention is to provide a condenser such that equal angular movements of the movable plates produce equal percentage changes in capacity, and in claim 1 the condenser is defined as being so formed that a given angular displacement of the movable plates produces substantially the same percentage change in capacity at any point within the range of the instrument. The range of the instrument, if in series with outside capacity, includes the entire circuit. While the defendant's condenser has not the same arrangement in graduation of area of plates, the testimony is convincing that, when arranged in a gang, it produces substantially the same percentage change in capacity at any point within its range. The result is that, although having a construction in which the plates are movable upon a shaft differently fixed with relation to the plates from that of the plaintiff, it produces the same result in substantially the same way.

The patents, cited by the defendant as anticipations of the Lowenstein Patent, were considered by Judge Thomas in Scovill Manufacturing Co. v. Satler, supra, and were excluded by him as having no application. I see no reason to form a different conclusion, as to those patents, from that reached by Judge Thomas.

■ As to the Belgian patent No. 222,216, issued to E. Girardeau, the mere showing of the date of the application for a foreign patent is not sufficient to establish the prior art, unless it is satisfactorily shown that the description of the invention was open to the public prior to the filing of the parent application by Lowenstein on June 28, 1910. There is nothing on the record sufficient to satisfy me that the patents cited by the defendant became open to the public prior to the date of the parent application or prior to the existence of an actual condenser made in accordance with Lowenstein's invention during the latter part of December, 1909, or early in January, 1910.

■ Some argument was made on behalf of the defendant that knowledge derived of foreign publications, if applied to other publications or to patents which do not disclose the precise conception of the patent in suit in their own terms, may be read together in order to show anticipation. These contentions are not tenable. The description in the printed publication of the statute is to be found within the four corners of such printed publication. Badische Anilin & Soda Fabrik v. Kalle & Co. (C. C. A.) 104 F. 802; Hanifen v. Godshalk (C. C. A.) 84 F. 649; Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Snook-Roentgen v. Stetson (D. C.) 237 F. 204; General Electric Co. v. Hoskins (C. C. A.) 224 F. 464.

■ The defendant has not, in my opinion, overcome the presumption of the validity of the patent by proof of anticipation by the prior art.

■ A decree may therefore be entered holding the claims of the patent in suit valid and infringed, with an injunction, accounting, and costs.

### Findings of Fact.

1. The condenser of the patent in suit is so constructed that given angular displacement of the movable plates produces sub-

stantially the same percentage changes in capacity at any point within the range of the instrument.

2. The condenser of the patent in suit having the logarithmic characteristic is not by its claims limited to a construction where all the capacity is located in the condenser as a single unit.

3. The patent in suit includes a condenser, the capacity of which may be in series with a fixed capacity, resulting together in a circuit capacity having the logarithmic characteristic.

4. The logarithmic characteristic of the patented condenser is accomplished by such a distribution of the area of the movable plates that, by the turning of the shaft, the capacity is introduced more gradually at the high frequency end of the working range of the instrument than at the low frequency end.

5. The defendant's gang condenser is so constructed that given angular displacement of its movable plates produces substantially the same percentage changes in the total circuit capacity at any point within the range of the instrument.

6. While the defendant's gang condenser is not shown to be so constructed that given angular displacement of the movable plates of each unit active between the stationary plates is in accordance with the logarithmic law, the result of the displacement of the movable plates of the units acting together in series with the entire circuit is substantially the same as in the patented condenser, and it is accomplished in the same way.

7. The patent in suit is not anticipated by the prior art.

Conclusions of Law.

1. The patent is found to be valid.

2. The defendant is found to have infringed the patent in suit.