**COLTMAN v. COLGATE–PALMOLIVE–PEET CO.**
No. 6753.

Circuit Court of Appeals, Seventh Circuit.
April 15, 1939.

Rehearing Denied June 6, 1939.

Drury W. Cooper, of New York City, Mason Trowbridge, of Jersey City, N. J., Arthur M. Hood, of Indianapolis, Ind., and Louis Quarles and David A. Fox, both of Milwaukee, Wis., for appellant.

Albert F. Mecklenburger and B. Gordon Aller, both of Chicago, Ill., and Charles D. Kelso, of New Albany, Md., for appellee.

Before EVANS, MAJOR, and TREANOR, Circuit Judges.

EVANS, Circuit Judge.

The plaintiff's suit is predicated upon a patent, No. 1,718,778, covering soap flakes. All of the claims were found by the District Court to be valid and infringed by defendant's two products sold under the names of Supersuds and Palmolive Beads.

The dates of filing applications and issuance of the patents are important, as is the entire history of the proceedings before the patent office.

The original application covers "Process of and Means for Flaking Soap." It was filed August 15, 1921, and was granted December 20, 1927 (No. 1,653,390). While the original patent was pending in the patent office, a divisional application was filed December 20, 1927, resulting in divisional patent No. 1,718,778, which was issued June 25, 1929.

On August 22, 1929, an application was made for a reissue patent of the parent patent. This application was granted, and the reissue patent, No. 18,546, issued July 26, 1932. This reissue patent was joined in the instant suit, but the bill was dismissed as to it before trial.

Defendant denies the validity of plaintiff's divisional patent and contends that its products are covered by its own two patents, issued to Lamont and Holliday. The Lamont patent was sustained by this court in Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 7 Cir., 90 F.2d 178, where the history of washing machine soap is set forth in much detail, and the story of the changes in these soaps, due to inventions, patentable and non-patentable, is related.

As in the last-cited case, the soap product with which this controversy is concerned is a granular product (as distinguished from a chipped, flaked or powdered soap product) which is processed by spraying liquid soap and heating the globules as they emerge from the spray so that they expand into tiny hollow balls (soap bubbles) and harden in that shape. The alleged virtues of the product are that they are very readily soluble and do not cake in water because they roll and spread over the surface of water when poured thereon. These processed soap granules constituted a new form of soap, distinct from that of either powdered soap or chipped soap.

Defendant disputes liability on several grounds. It denies infringement, denies that plaintiff's patent claims read upon defendant's products. If this contention be erroneous, it argues that only the claims added to the patent after plaintiff had knowledge of defendant's products and revised his application with that fact in mind, are infringed, and these claims are invalid. The insertion of these claims, defendant contends, seven years after the filing of the original application and after knowledge of defendant's products, was not only legally unauthorized but plaintiff should be denied the right to assert them because of laches and estoppel.

Finally these claims are challenged because they find no basis for support in the original application. They are based on unwarranted expansions of, and amendments to, the original application.

Defendant also specifically denies infringement on the ground that its product is not taught by the claims of plaintiff's patent; that the product made at an inter partes run alleged to be similar to defendant's products was accomplished by means not taught in plaintiff's patent. Defendant sprays its liquid, neat or kettle soap, into a heated tower (not on an apron), and its product has the general characteristic of being a spherical hollow—a soap ball with a single void, and thin, but not fragile walls. It argues that plaintiff's product, if made according to his patent, which teaches the spraying of a liquid soap onto an "apron" forming a film thereon, and being hardened by either cold or warm air, is a fragile sheet of soap, spongy in character, the fragments of which, on removal from the apron, are irregular, tiny, stalagmite-form, or fragments, wafer in shape, with multiple voids. Defendant cites the fact that both warm and cold air are prescribed as the hardening agent, and plaintiff's patent does not specify, as do defendant's patents, the specific high heat range indispensable and necessary to obtain

the single void, spherical formations, wherein lies the asserted highly-advantageous, desirable qualities of defendant's soaps made pursuant to the teaching of the Lamont patent.

Coltman's application for a patent, filed *August, 1921,* discloses an invention covering both a process and a product. It describes mechanism for making a thin soap flake, porous and friable in character, and having great volume per unit of weight. Very briefly stated, Coltman taught the use of liquid soap of about 25% moisture, which he first thinned with a fluid, then aerated by mixing with a wire stirrer. He sprayed this thinned, aerated solution by means of pressure, through a nozzle, into a mist upon a moving apron, and the mist formed a film or pellicle thereon. As the apron rotated the film of soap was subjected first to a warm air current to desiccate and dry the flakes, then to cold air current to set them (prevent lumping). When the apron revolves around the end, the film becomes dislodged from the apron and breaks into flakes, and a scraper was used to remove such particles as failed to dislodge. The resultant flakes were thin, porous, light, friable, and readily soluble. It contained many voids surrounded by thin, cellular, spongy walls.

This application, made in August, 1921, was the result of accidental discovery by Coltman when he noted the flakes of soap which peeled from his face when he had permitted his shaving lather to dry. He followed this incident up with experimentation in the form of spraying liquid soap or froth, by means of an insecticide sprayer, on tins which he placed in a hot oven. Thereafter he visited several soap factories and conversed with manufacturers as to soap flake production.

The original application had twenty-eight claims, thirteen of which pertained to method of flaking soap, and fifteen claims, to the mechanism. In October, 1921, five product claims were added to cover a soap flake. This application resulted in patent No. 1,653,390, issued December 20, 1927.

Divisional patent No. 1,718,778, issued June 25, 1929, had seven product claims. These claims differed from the parent claims in that they made no mention of being a *flake* soap product. Instead, the product was variously defined as characteristic component particles or *bodies* of *void formation,* with *thin cellular, porous walls.* In other words, the language of the claims seems to attempt to describe bodies of ball or globular like formation with thin porous walls, in contradistinction to the product of the parent patent which dealt with an irregular spongy *layer* or *flake* of soap.

The five product claims of the original patent (here in issue) are set forth in the margin.[1]

The seven product claims of the divisional patent, all of which are here in issue, are set forth in the margin.[2]

[1] "29. In a product of the class described, a soap flake having voids therein.

"30. In a product of the class described, a soap flake having a greater volume per unit of weight than that of its ingredients before joined.

"31. In a product of the class described, a soap flake whose ingredients have been aerated.

"32. In a product of the class described, a soap flake whose ingredients have been increased in volume to increase the volume of the flake per relative unit of weight.

"33. In a product of the class described, a soap flake being formed of a substance having voids therein."

[2] "1. A spray processed dry soap product composed of component particles or bodies of soap material of void formation, the voids therein being substantially surrounded by thin cellular walls, said walls being sufficiently porous to render the product absorbent of and readily soluble in water.

"2. A substantially dry soap product consisting of soap material having cellular or porous walls, being highly absorbent of and quickly soluble in water, said product having voids therein surrounded by said cellular walls to thereby present available surface area which is large relative to the amount of soap contained therein.

"3. A soap product which is light and is readily soluble in water and composed of soap particles which are generally of cavity or void form surrounded partially by walls which are of a porosity noted particularly by small cells or pores interconnected by smaller finely divided walls.

"4. A spray processed soap product composed of generally hollow particles characterized by their dry thin walls notably filled with minute porous cellular-like openings.

■ The defendant seeks to reflect upon plaintiff's discovery by referring to it as a *paper patent* by which it is meant that it has never been put into commercial use, never been recognized by the trade and its possessor has received no royalty for its license.

Members of the patent bar frequently refer in a scornful or derisive way to a *paper patent*. It is hardly fair or just to do so. In many cases the inventor may not be in the necessary financial position to make the patented article and he may be unable to persuade its adoption by manufacturers who would have to replace their plant machinery and equipment in order to follow the teachings of the new patent. Nevertheless the discovery may well be patentable.

Likewise, the patent may cover a discovery which is somewhat ahead of its time, and its use and adoption must be postponed several years from the date of the patent's issuance.

■ It must be conceded, however, that evidence of immediate, wide, and extensive use following the appearance of a patent may furnish invaluable evidence in cases which would otherwise be doubtful, and may well be described as more convincing and persuasive with courts than any other evidence save recognition by the trade and the payment of substantial royalties for a license to use the new patented discovery. Recognition by the trade is the best and most persuasive evidence that can be offered. The tribute of those engaged in the industries affected, especially when the tribute is evidenced by the payment of substantial royalties, is by far the most persuasive and unimpeachable evidence that can be offered to support the asserted validity of patent claims in litigation. Self interest of the licensee can be relied upon to prevent the payment of royalties, except for discoveries of recognized merit, and the larger and more numerous the royalty payments, the stronger the inference that payment is made only after the licensee has satisfied itself that the invention is meritorious and the claims covering the process or product are valid.[3]

Although the patent in suit has had no such recognition either from scientists or by the payment of royalties, it by no means follows that the discovery therein described is lacking in those novel features which support in fact and in law the essential requirements of a valid patent.

While the evidence in this case fails to show the payment of royalties, there is, however, one phase of this matter which requires consideration.

---

"5. A heat treated spray processed porous soap product solidified into characteristic cellular component particles or bodies of void formation, so as to be large considering the amount of soap contained in each component particle or body thereby to present available surface area which is large relative to the amount of soap in each particle or body whereby each particle or body may be readily dissolved in an aqueous liquid, the said void formation being more particularly defined as thin walls substantially dry throughout, the thin dry walls being porous and partially enclosing cavity-like voids in the soap product.

"6. A soap product formed of substantially small bodies having voids therein substantially surrounded by thin walls, the surface of said walls exhibiting minute cellular formation.

"7. Component particles of a porous soap product which are characterized by their thin dry porous cellular walls and with voids therein substantially surrounded by said cellular walls and of such size as to cause the particles to be large considering the amount of soap contained therein."

[3] Thropp's Sons Co. v. Seiberling, 264 U.S. 320, 44 S.Ct. 346, 68 L.Ed. 708; Eibel Process Co. v. Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Vortex Manufacturing Co. v. F. N. Burt Co., D.C., 297 F. 513; Johnson v. Lit Bros., D.C., 278 F. 279; Id., 3 Cir., 284 F. 259; Elliott & Co. v. Youngstown Car Mfg. Co., 3 Cir., 181 F. 345; Rose v. Hirsh, 3 Cir., 77 F. 469; Kurtz v. Belle Hat Lining Co., 2 Cir., 280 F. 277; Franc-Strohmenger & Cowan v. Arthur Siegman, Inc., 2 Cir., 27 F.2d 785; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910; In re Farrand, Cust. & Pat. App., 49 F.2d 1035; Langston Co. v. Mengel Co., D.C., 60 F.2d 151; O. K. Jelks & Son v. Tom Huston Peanut Co., 5 Cir., 52 F.2d 4; Detroit Motor Appliance Co. v. Taylor, 7 Cir., 66 F.2d 319; E. I. Du Pont De Nemours & Co. v. Glidden Co., 2 Cir., 67 F.2d 392; Therm-O-Proof Insulation Co. v. Slayter & Co., 7 Cir., 80 F.2d 557; Nat. Motor Bearing Co. v. Cons. Motor Parts, D.C., 11 F.Supp. 549; Corpus Juris, "Patents," Sec. 95, and cases cited to footnote 88.

The evidence supports a finding that Lamont, under an assumed name, visited the plaintiff and sought to purchase his patent. The price plaintiff asked was $25,000. The negotiations led to naught. At most they were negotiations which never bore fruit. They were conducted at a time when the litigation between two large soap manufacturers was heated and the outcome uncertain.

Moreover, while the sum mentioned in the negotiations, to-wit, $25,000, is substantial, yet the amount involved in the infringement suit was large. The volume of annual sales of wash soap cartons is expressed in hundreds of millions.

A principal subject of controversy turns on whether the parent application is sufficiently broad to sustain the divisional application.

As indicative of the breadth of the parent patent a structure was built according to the teachings of the patent and a run made of soap in accordance with the process description, and it is plaintiff's contention that the resulting product, P. Ex. 117, the inter partes or Chicago Run, is conclusive evidence that the original patent taught a method whereby a product very similar to Supersuds and Palmolive Beads could and would result.

Defendant, however, says that the machine does not follow the teachings of the patent, but was built in the light of defendant's practices and experiences, and that the reason the inter partes run product so closely resembles the defendant's products is that the sprayed particles are subjected, after leaving the nozzle, to an up-current of extremely hot air which escaped from the oven through which the apron ran, and that this hot blast of air was the equivalent of the teaching of the Lamont discovery and patent, or, at least, was sufficient to form a crust on the particles so that when they struck the apron they retained their individual shapes and did not coalesce into a real film or layer on the apron. Defendant points out that the divisional patent calls for "warm" air of sufficient avidity to remove the moisture whereas defendant's patent teaches the use of hot air of 300 to 500 degrees Fahrenheit so as to cause the moisture in the drop of liquid soap to turn to steam and thereby puff the globule into its hollow, spherical form.

It is defendant's contention that a product made in accordance with plaintiff's teaching would be a flake of spongeous character, like in the photograph here set forth:

It would not look like the product of the inter partes run which while not identical with, is at least quite similar to that of Supersuds and Palmolive Beads.

**PLAINTIFF'S PRODUCT**
Plaintiff's Exhibit 130

To more correctly appraise the differences between the specifications and claims of the parent patent and the divisional patent, we place analogous descriptive provisions in parallel columns and stress words that signify the differences.

| *Parent Patent.* | *Divisional Patent.* |
|---|---|
| a) Describes soap *Flakes.* | a) Soap flake having *voids* therein. |
| b) *Thin* flake, practically *transparent* and in a state next to powder. | b) Soap flake which is particularly *fluffy*, a characteristic crystalline *void-like thin-walled* structure which is exceedingly *light.* |
| c) The formation of a *fine sheet* of soap on the apron, which is carried through an evaporating zone as a hot air blower or a *warm air* oven or chamber. The soap thereby becomes desiccated and "frozen" and is in friable condition, so that it breaks up in *fine flakes* as the apron travels around the roller. | |
| d) By reducing density of liquid soap used the *flakes* will be light and porous. He then aerates the thinned liquid so the soap will be frothy and very light. The original soap used has about 25% moisture. | d) Soap from vat, of any suitable percentage of water, and may be thereafter thinned. A *hot air* jacket may surround mixing vat to keep contents at a certain temperature. Soap is aerated. |
| e) Sprayed in the form of a *mist* upon the traveling apron, forming a *thin film.* The soap will *spread evenly* thereover by its own action. As the belt travels, *warm* air of sufficient avidity to remove the moisture is directed against the soap by means of blower. | e) Sprayed in the form of a comparatively fine mist and forms a thin sheet on the traveling surface. Warm air is used to remove moisture. The soap will be *spongy* and friable in nature and tend to crumble in fine flakes when disturbed. |
| f) The scope of the present invention should extend to any method of desiccation. | |
| g) The flake which is very desirable being spongy, friable and of a very dissoluble character. The feature of spraying a thin film of soapy solution upon a traveling surface, against which is directed currents of warm air, is considered of importance. | g) The soap will be somewhat spongy in character and friable so that it will break or crumble into flakes or particles, which will have a definite porous structure and *contain voids* therein which render them light and *fluffy* giving them greater *volume* and *solubility.* Having voids therein, when the flakes are removed from the belt, rather thin walled cell- |

ular structures are produced, which do not thereafter crumble into powder. A greater surface is exposed by the thin celled walls separated by the voids, and consequently greater solubility is obtained. The particles of soap contain definitely formed voids within whereby the particles are relatively hollow and are surrounded by cellular walls, these walls appearing as small cells or pores interconnected by smaller finely divided walls. The particles are formed as such to a large extent in the making by the processes disclosed in my parent case, it being understood that *each particle* may assume *the entity of a separate body,* and may consist of a thin shell or wall of dry soap material which is thus solidified with *a void* formed therein and with this thin shell or wall of a cellular or porous structure surrounding *the void.*

The important facts appear in the chronological statement herewith set forth:

CHRONOLOGY.

| | |
|---|---|
| 1921—August 15 | Application for plaintiff's patent 1,653,390. Process and Means for Flaking Soap. No Claims for Product. |
| 1921—October 5 | Application amended to include five product claims, all more limited to soap flakes. |
| 1922—June 12 | 1st Office action. Product claims rejected. |
| 1923—June 12 | Product claims cancelled, with reservation to embody them in a divisional application in the future. |
| 1923—December 27 | 2nd Office action. |
| 1924—December 23 | One year later, plaintiff's reply to 2nd Office action. |
| 1925—March 16 | 3rd Office action. |
| 1926—March 16 | Plaintiff's reply to 3rd Office action. |
| 1926—May 14 | 4th Office action. |
| 1926—June | Lamont's Product produced and samples given to Colgate and Co. and used by various housewives. |
| 1926—August 5 | Colgate & Co., purchased manufacturing rights under Lamont invention. |
| 1926—August to May, 1927 | Colgate & Co., preparing for commercial production and sale of Super Suds. |

1927—May 14 — Plaintiff's reply to 4th Office action.

1927—May 17 — Defendant began commercial sales of Super Suds.

1927—May 25 — Lamont filed application for patent 1,652,900.

1927—May 26 — Plaintiff's first application allowed.

1927—November 22 — Plaintiff paid issue fee for patent 1,653,390.

1927—December 13 — Lamont patent 1,652,900 issued.

1927—December 20 — Plaintiff's patent 1,653,390 issued.

1927—December 20 — Plaintiff filed so-called divisional application for Soap *Flakes* (patent in suit, 1,718,778) reasserting claims that had been cancelled June 12, 1923.

1928—September 6 — Plaintiff cancels all "flake" claims, inserts new claims, some of which with amendments became claims of the patent in suit and others were later voluntarily withdrawn.

1929—May 25 — Claims were amended to appear as in the patent. The other claims for the puffed shell structure were voluntarily withdrawn, and the specification was amended to describe for the first time a soap product in which "the particles are relatively hollow and are surrounded by cellular walls."

1929—June 24 — Issue of plaintiff's patent 1,718,778 in suit.

1929—June 28 — Plaintiff's first notice of infringement to defendant.

1932—July 29 — Plaintiff's second notice of infringement to defendant.

1933—April 27 — Present suit begun.

We are confronted at the threshold of this case with the defense that the plaintiff's divisional patent is void because its claims were not for "the same invention" as was set forth and described in the original application and claims. The cases of Chicago & N. W. Railway Co. v. Sayles, 97 U.S. 554, 24 L.Ed. 1053, and Eagleton Mfg. Co. v. West Mfg. Co., 111 U.S. 490, 4 S.Ct. 593, 28 L.Ed. 493, announce the rule applicable in such cases.

■ Admittedly, the same rule applies to the divisional application and patent as governs amendments to original applications and claims. Dwight & Lloyd Sintering Co. v. Greenawalt, 2 Cir., 27 F.2d 823; Scovill Mfg. Co. v. Balistocky, D.C., 48 F.2d 875.

■ In either case the original application is the mother or parent application, and all claiming to be her offspring must show blood stream connection with her. Unfortunately, the proof of the exact invention is not always clearly disclosed by the words used. When the solicitor's vocabulary is full to over-flowing and words of both elastic and comprehensive meaning are chosen, it is difficult to lay down or apply a rule or a test by which it may be confidently said the amendments to the original specifications and claims, or the application and claims of a divisional patent, are for "the same invention" or as stated in the earlier cases, "conform to the original application."

■ Are the claims of the divisional patent warranted by the disclosures of the original patent application?

Our answer depends on our conclusion as to the heart of the conception of each of the two patents. It is worthy of note that in both patents we are dealing with product claims. Their difference may well be stated generally as the difference between (a) spongy soap flakes and (b) soap particles of cavity or void formation surrounded by thin dry walls which are porous.

We entertain the fear that there is danger of losing the thought in the words.

The distinction between the two kinds of soap may be emphasized in the first instance by underlining the word "flakes." There is nothing about either a flake or a chip suggestive of the essential characteristic of claim one of the divisional patent, a particle of "soap material of void formation, the voids being substantially surrounded by thin cellular walls, said walls being sufficiently porous to render the product absorbent of and readily soluble in water."

The inventor's own statement of the invention is illuminating. The specifications of the original patent say, "from actual experience it has been found that shaved soap must be capable of instantaneous dissolution in the washing fluid, and as a requisite thereto, the shavings must be very light and very thin." Conflicting with this statement is the statement in the specifications of the divisional patent which say that he is providing a "soap flake having voids therein and more particularly a soap flake having greater volume per unit of weight than of its ingredients before mixed."

The original specifications also contain language which stresses the thought of a very fine soap flake rather than the soap particles which consist of cavities or voids surrounded by walls which are porous, somewhat globular, and are lighter in form, that is, somewhat larger than the amount

of the soap contained therein. He says, "By the time the soap reaches the end of the belt's horizontal run (he is now describing the process) it will be of a spongy and friable nature, that is, there will be a tendency for it to crumble into fine flakes as soon as it is disturbed. * * * It is further to be noted that the use of this particular process will produce a flake, which is very spongy in character, and which is friable, so that it will immediately break and crumble into bits when disturbed; the flake having a great avidity to dissolve instantly upon mixing with a washing fluid."

Plaintiff was not describing particles of soap which constitute the basis of the claims in his divisional patent when he spoke of *sponge-like* qualities. By sponge-like, he meant a series of connected particles separated by numerous air spaces as illustrated above. In his divisional patent claims each particle was separated from every other particle. Each was very much alike, and each had *a* void with the walls so constituted (thin) that they would readily and completely dissolve.

This was the conception of the Lamont patent and by him so stated. The latter patent issued a year before plaintiff inserted the claims now relied upon in the divisional application.

There is still another very significant difference between the original and the later patent which prevents the enlargement of the discovery of the original application so as to become a basis for the claims of the divisional patent. When plaintiff described his process and the method he followed to secure his flakes, he said he used *"warm"* air for the purpose of *drying*. The product described in the divisional claims needs *hot* air, and the word "hot" as used in this art means a temperature ranging from 300 to 500 degrees Fahrenheit. Warm air may dry, but it was a hot air that produced the puffing of the particles and the voids, as well as the *single* particles of soap. These are essential qualities of defendant's infringing soap.

It is true that in *one* instance plaintiff used the word "hot" in the specification, but it was not used other than as equivalent to warm, in its purpose, namely, that of drying.

The other qualities which result from the injecting of highly heated air into the liquid soap were not only absent from the description in the specification, but their absence strongly negatives the existence of what is the heart of the claims of the divisional patent.

Both hot and warm air are effectively used in drying liquids. But hot air applied to the same liquid may produce peculiar results in shape, in form, in hollow particles, etc., which warm air will not accomplish. One who described as a step in his process the use of warm air for drying purposes could not have appreciated the use of hot air for very important purposes other than drying.

■ Whether amendments or modifications to specifications and claims are outside the invention disclosed in the original application must turn upon the facts of each case. The recent decision of Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 56, 59 S.Ct. 8, 83 L.Ed. 34, deals with a different fact situation, but the discussion and conclusions lend support to the conclusion here reached. No new rule or principle of law was announced in that case. It follows Permutit Co. v. Graver Corp., 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163, and Powers-Kennedy Corp. v. Concrete Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278.

The reason for the conclusion in the Schriber case was that the amended claims were unauthorized because not disclosed in the original application, and finds some similarity and analogy in the differences between original and amended specifications and claims in this case.

Lest there be an unjustifiable swing against the allowance of amendments which are within the scope of the original disclosure it should be emphasized that little help in determining the question may be found in judicial precedents. The facts in each case are necessarily different.

To illustrate—In the instant case our trouble has been to reconcile the product made in the inter partes run and the difference which we deem essential in the original and the modified specifications and claims of the divisional patent.

Whether the product which was created by the inter partes run was either the natural or possible result of the process and machine disclosed in the original patent is a matter of sharp dispute. It presents controverted issues which are as complicated and controverted as are the defenses to the divisional patent itself. Factual disputes are irreconcilable.

Elaboration of the reasons for our conclusion in respect to the non-conclusiveness of this experiment would hardly be justified. We content ourselves with the observation that the product which was made would never have been produced under the teachings of the original patent or any of the withdrawn or modified claims of said application. In fact, it is difficult, if not impossible, to escape the conclusion that soap similar to defendant's Supersuds and Palmolive Beads would in fact never have been produced at all under this patent or modification, had these soaps not been brought out and put into use before the inter partes run was undertaken.

■ Another defense which defendant raises is a serious one and is based upon plaintiff's laches and intervening rights of defendant and its predecessor. The lapse of some seven years between the filing of the original application and the filing of a divisional application is not itself a bar to the successful prosecution of a divisional application. Such delay, however, does not inspire confidence in the later application, when it appears that in the meantime others working in the art have developed a product and disclosed a process for making the article which are somewhat like the product and the process described in the specifications and claims of the divisional patent.

■ Under the decision of Overland Motor Co. v. Packard Motor Co., 274 U.S. 417, 47 S.Ct. 672, 71 L.Ed. 1131, wherein this court was reversed, the right of the applicant of a patent to proceed interminably in the patent office without subjecting himself to the charge of laches, was sustained, provided the delays were not violative of the rules of the patent office.

■ In the present case the file wrapper shows that the plaintiff generally took approximately the entire year allowed by the patent office rules within which to file proposed amendments and he thus kept his application alive for years. In so doing, under the last-cited case, he was not guilty of laches nor was his patent subject to attack because of such delays so long as the original application was pending.

■ It is difficult to understand how intervening rights of other parties could affect the validity of the divisional patent excepting only as there might be a showing of prior public use for more than two years before the appearance of the new claims in the divisional application. The evidence does not satisfy us that there was such prior public use.

Our conclusion of invalidity rests upon the insufficiency of the disclosure in the original application to support the claims of the divisional patent.

The decree is reversed with directions to dismiss the complaint.