**BAXTER LABORATORIES, INC.,**
Plaintiff-Appellant,

v.

**CORN PRODUCTS COMPANY,**
Defendant-Appellee.

No. 16421.

United States Court of Appeals
Seventh Circuit.

May 1, 1968.

Rehearing Denied June 7, 1968.

Edward A. Haight, Britton A. Davis, Haight, Simmons & Hofeldt, Chicago, Ill., John M. Knowlton, Morton Grove, Ill., for plaintiff-appellant.

John A. Dienner, F. Vern Lahart, Edward C. Grelle, Frank E. Robbins, Brown, Jackson, Boettcher & Dienner, Chicago, Ill., for defendant-appellee.

Before HASTINGS, Chief Judge, DUFFY, Senior Circuit Judge, and CUMMINGS, Circuit Judge.

DUFFY, Senior Circuit Judge.

Plaintiff is the owner of Wallerstein U. S. Patent No. 2,531,999, issued November 28, 1950, based on an application filed October 13, 1947. The term of this patent expired on November 28, 1967. The patent is on a method of converting ordinary plant starch to crystalline dextrose. The process is generally characterized as an "enzyme hydrolysis" of starch. Plaintiff sued defendant for infringing this patent, and defendant filed a counter-claim praying for a declaratory judgment that patent No. 2,531,999 is invalid.

The trial court found the patent invalid for failure to satisfy the requirements of 35 U.S.C. § 112. The Court stated: "The specification of the Wallerstein patent is not written in 'full, clear, concise and exact terms' " as required by the statute. However, on the assumption that the Wallerstein patent is valid, the Court found " * * * defendant's process does not infringe the process claimed

by the Wallerstein patent. It does not come within the claims of the Wallerstein patent and does not operate in the same manner. It obtains a different result through different means."

Plaintiff is engaged in the manufacture and sale of pharmaceutical supplies and continues the business of the Wallerstein Company in the manufacture and sale of enzyme preparations. Defendant Corn Products Company is a manufacturer of products derived from corn including the manufacture of crystalline dextrose which it sells under the tradename "Cerelose."

Dextrose is a chemical substance of the class of carbohydrates. It has a sweet taste and has a high nutritive value. Dextrose is sometimes called "corn sugar." Crystalline dextrose is manufactured from corn starch or some other plant starch by a crystallized chemical change known as hydrolysis. It is a relatively pure form of dextrose. It is to this particular product that the Wallerstein patent relates.

The hydrolysis of starch to dextrose using acid as a catalyst was conceived as early as 1811 by the Russian scientist Kirchoff. He produced a dextrose syrup which could be used as a liquid syrup or reduced to dry form as crystals or as a solid slab.

The possibility of using an enzyme preparation to hydrolyze starch to dextrose was known as early as 1927. The difficulty encountered was to effect such a hydrolysis of starch on an economical commercial basis.

In the process of hydrolysis, starch usually is suspended in a relatively large amount of water. This starch suspension is frequently referred to as "substrate." Since the starch chains molecule is relatively stable, the process of hydrolysis does not readily occur. A catalyst is required to initiate and assist the reaction. An acid or an enzyme may be added to the substrate. The reaction then proceeds through the initial thinning of the starch to the final formation of the dextrose molecules. The resulting "hydrolyzate" is a liquid solution which contains small amounts of reversion products and the residual acid or enzyme.

For commercial purposes, the dextrose is recovered from the hydrolyzate in one of three forms. It can be an ingredient of syrup or solidified into so-called "slab sugar", or the crystals of dextrose may be recovered apart from the other substances.

The enzymes mentioned in this case are derived from fungi (molds). They excrete through their cell walls enzymes of various digestive abilities or activities. A large number of enzymes of "activities" are produced by a culturing of a single kind of mold such as Aspergillus oryzae or Aspergillus niger. Among these activities is an amylase, which hydrolyses starch to dextrose.

Modern science has not been able to chemically define enzymes.[1] They are usually described by what they do, not by what they are.

Leo Wallerstein and his brother founded a brewing consulting laboratory shortly after 1900. Within a few years, they discovered an enzyme which prevented bottled beer from turning cloudy. They founded the Wallerstein Company to market the new product.

After the coming of prohibition, they developed enzymes useful in the textile, leather, baking and other industries.

1. Definitions of "Enzyme", "Enzyme Preparation having Starch-Glucogenase Activity" and "Transglucosidase" were stipulated as follows:
   "Enzyme: Specific, cell-independent catalysts of biological origin, which are proteinaceous and can be destroyed by heating."
   "Enzyme Preparation having Starch-Glucogenase Activity: Any enzyme-containing substance which gives a positive value when subjected to the procedure and calculations described in U.S. 2,531,999, column 3, lines 14 to 51."
   "Transglucosidase: An enzyme which produces non-fermentable sugars, e. g., isomaltose and panose, from some starch hydrolysis products."

Their company merged with Baxter Laboratories in 1958.

Leo Wallerstein became interested in the use of enzymes to make crystalline dextrose. In the 1940s, he began experiments which led to the invention of the patent in suit.

The fundamental of starch conversion was well known. The deficiencies of acid hydrolysis in producing limited yields of dextrose with relatively high concentration of taste and color imparting reversion products was also recognized.

The patent in suit discloses and claims as invention the basic steps necessary to the successful enzyme hydrolysis of starch to produce a dextrose hydrolyzate of such character that discrete crystals of dextrose may be readily obtained.

It is apparent that Wallerstein knew that the formation of excessive reversion products during the reaction prevented the production of a hydrolyzate suitable for making crystalline dextrose.

In order to increase the yield of dextrose and to facilitate crystallizing, Wallerstein departed from the teachings of prior workers in this field. The patent teaches that no preliminary treatment whatsoever is required prior to adding the enzyme, although for economic reasons some preconversion or acid thinning is desirable. Wallerstein explains that it should be kept to a minimum and that with lesser treatment there will be higher yields of dextrose.

Prior enzyme researchers such as Dale and Langlois had urged preliminary thinning to a dextrose equivalent (DE) of between 40% and 60%. Wallerstein prefers to keep it below a DE of 30%, and gives examples of lower DE thinning and, in one instance, of none at all.

The patent further teaches that an enzyme of specified minimum potency should be used. Such potency is termed in the patent as "starch-glucogenase" activity.

The patentee defines the potency of the enzyme in terms of its initial reaction velocity "k" and sets forth a formula and analytical procedures for its determination. The patent states the enzyme should have a starch-glucogenase "k" value of "at least 1.0."

The patent in suit was called to the attention of the defendants by its firm of consulting engineers within a month after it had issued. Defendant's Research Department commented that the new process " * * * should be thoroughly investigated before any conclusion can be drawn regarding the economic potentialities of the process."

On June 19, 1954, defendant's Research Department wrote: "A patent recently issued to Wallerstein, U.S. Patent 2,531,999 covering * * * a process which I have always felt would some day be of industrial importance, particularly to our company. The process is limited somewhat * * * by the cost of available enzymes and the unavailability in industrial quantities of most suitable enzymes. * * * "

The commentary pointed out that Aspergillus oryzae is a costly source of the enzymes, and suggested the use of other fungal sources which had been discovered since Wallerstein's invention.

Later, defendant began limiting the preliminary thinning of the starch so as to preclude formation of substantial reversion products prior to the enzyme hydrolysis. The use of "low DE substrates" brought about substantial improvements in the yield of dextrose. As the extent of such pre-treatment was lessened, the extent of final conversion to dextrose was increased. Furthermore, defendant began to purify its enzymes to at least the minimum potency described in the patent. Enzymes from various fungal sources were used. The more economical Aspergillus niger strains were preferred.

Defendants argue that the alleged invention is invalid because it is obvious in view of the prior art. On the other hand, defendant also argues that the patent is so vague that it violates 35 U.S.C. § 112 and also, that it is so vague as to render it meaningless to one

skilled in the art. We disagree. We hold that the patent is not invalid for either reason.

When the Wallerstein patent was issued, defendant's engineers and scientists read it and understood it. They experimented and tried the process and it worked. Answers to interrogatories indicate that defendants tested the procedure as early as 1954.

It is true that defendant's scientists discovered a more economical method to purify the niger enzyme by the absorption of transglucosidase on bentonite clay. However, the enzyme is as described in Wallerstein.

Defendants strongly urge that the discovery of the role of transglucosidase was theirs. However, it appears from defendant's own reports that credit for the discovery of transglucosidase in these fungal sources should go to Pazur, French and others, whose data came into public literature in 1950–1952.

The correct statement of the situation would be that while the enzyme is as described by Wallerstein, the source and the method of procuring it has been improved by defendant and others. As plaintiff amply describes it "Wallerstein laid the road. The defendant drove over it."

Wallerstein's own laboratory experiments proved the success of his process. By use of enzymes as a catalyst, he obtained higher yields of crystalline dextrose. The production of objectionable reversion products was minimized.

Apparently the only reason defendant did not earlier change from acid hydrolysis was the cost involved and the difficulty in obtaining the enzyme needed.

We have considered additional arguments of invalidity made by defendant. Nevertheless we hold that the claims of the patent in suit here in issue are valid.

As to infringement, defendant refers to the patent in suit as a paper patent which should be narrowly and strictly construed. However, failure by a company not in the business of convert-ing starch or producing crystalline dextrose, to spend large sums for equipment and possibly new buildings, should not be the basis for describing the patent as a paper patent. See Coltman v. Colgate-Palmolive Peet Co., 104 F.2d 508, 511 (7 Cir., 1939); Aerosol Research Co. v. Scovill Manufacturing Company, 334 F.2d 751, 756 (7 Cir., 1964); Briggs et al. v. M. & J. Diesel Locomotive Filter Corp. et al., 342 F.2d 573, 577 (7 Cir., 1965).

It is erroneous to say, as does the District Court's decision, that defendant's process does not come within the claims. In our view, defendant's process reads squarely on the process described in the patent. We think it was also incorrect to say that defendant gets a different result through different means. We think defendant obtains the result which Wallerstein described.

The District Court's opinion states: "Since the Wallerstein patent claims a process for the production of crystalline dextrose in a better manner than the acid conversion then employed, and mentions nothing about the removal of transglucosidase from the enzyme employed, the defendant's process is not that of the Wallerstein patent."

It was, apparently, an important consideration in the opinion of the District Court, that the patent did not mention by name the removal of transglucosidase from the enzyme. It is true that the name transglucosidase was not used, but in 1947, neither Wallerstein nor anyone else knew of the presence of transglucosidase in his enzyme.

The object of the patent in suit was to effect hydrolysis under such conditions that

    a) "crystallization is markedly facilitated;"

    b) "the production of undesirable by-products of little value minimized", and

    c) "increased yields of dextrose are obtained."

In 1954, defendant, after studying the Wallerstein patent, obtained these ob-

jects and did so before it invented an improved enzyme and before removing transglucosidase.

To illustrate the state of the art, defendant's expert, Earl R. Kooi, director of Exploratory Research at Corn Products Co., in 1954, observed as to crystallization "Just why crystallization of dextrose from an enzyme-converted liquor should be so much more rapid than crystallization from an acid-converted liquor is difficult to understand."

We conclude that defendant's commercial process utilizes the principle of the Wallerstein invention and achieves the result intended by that invention. In its process, defendant limits its pre-treatment of the starch to a low DE and it purifies its enzyme to a "k" of at least 1.0.

We think the proof on the trial demonstrated that in the Wallerstein process it makes no difference whether the dry enzyme is dissolved in one part or thirty parts of water prior to subjecting the starch to it. The results would be no different if the dry enzyme powder was stirred directly into the starch-conversion tanks which hold thousands of gallons of water.

We agree with plaintiff that the "k" value specified by Wallerstein must be determined on the basis of the solid material and not on the basis of solids diluted by water.

Defendant makes a serious charge which is found too often in patent litigation. It argues that the patent in suit is unenforceable because it was procured by misrepresentation.

As we understand the charge, defendant says Wallerstein's patent solicitor was wrong when he characterized the "k" value of the patent as a "quantitative" expression of the activity of the enzyme. Defendant now says that "k" is a "qualitative" measure of activity and infers that the solicitor misled the patent office.

What is important is that those reading the patent application are fully advised of what "k" means and how it is determined. The District Court found that the "k" method of determining the potency of the enzyme is set out in the patent in "such 'full, clear, concise and exact terms as to enable any person skilled in the art' to likewise measure and determine the potency. * * *" We agree!

We hold that no misrepresentation was made, and that there is nothing in the record to show that the Patent Office Examiner was misled.

Due to the unfortunate length of this opinion, we have not discussed several additional arguments presented by defendant. We have considered the same and are unable to agree with such contentions.

We hold that the claims of the Wallerstein patent in suit here in issue are valid and that such claims are infringed by defendant's process.

The judgment of the District Court is reversed and the cause is remanded for further appropriate proceedings consistent with this opinion.

Reversed and remanded.